FOLEY, ET AL. *v.* COUNTY COMMISSIONERS OF CARROLL COUNTY, ET AL.

[No. 38, September Term, 1967 (Adv.).]

164

*Decided June 9, 1967.*

The cause was argued before HAMMOND, C. J., and HOR-
NEY, MARBURY, BARNES, McWILLIAMS and FINAN, JJ.

*Leonard J. Kerpelman* for appellants.

*Richard W. Case* and *John T. Joseph,* with whom were *Smith,
Somerville & Case* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

Seven appellants, plaintiffs below, filed an action "on behalf
of themselves and for the benefit of all similarly situated," in
the Circuit Court for Carroll County against the County Com-
missioners of Carroll County (County Commissioners) and
the Sanitary Commission of Carroll County (Commission). The
lengthy declaration concluded with prayers for declaratory re-
lief and the issuance of a writ of mandamus; in essence, the
appellants challenged the action of the County Commissioners
in approving the creation by the Commission of the Freedom
Sanitary District. The appellees filed a motion for summary
judgment, supported by affidavits and 22 exhibits, attempting
to show that the sanitary district was created in compliance with
applicable law. Following a hearing, the Circuit Court for Car-
roll County (Weant, J.) granted appellees' motion for sum-
mary judgment. This appeal followed.

In April, 1965, the County Commissioners acting pursuant
to Maryland Code, Article 43, section 646 (1965 Repl. Vol.)
created a "district" known as The Carroll County Sanitary
District. A "district" is a body politic and corporate created
for the purpose of acquiring, constructing, maintaining and op-
erating water and sewer systems. Article 43, section 646 and
645(1).

At the same time, the County Commissioners appointed the first members of the Commission of the Carroll County Sanitary District, Inc.[1] The Commission, on May 21, 1965, held an organizational meeting and thus, on that date, became functionally competent to carry out the various powers and duties bestowed upon it by Article 43.

Since the County Commissioners did not signify otherwise, The Carroll County Sanitary District, by statute, is "deemed to be formed to exercise its powers within the entire incorporating county." Article 43, section 646.

The statutory scheme contemplates that the Commission will establish within the county one or more "sanitary districts," each sanitary district being "a defined geographical area, bearing a distinctive name, located within the territory in which a district exercises its powers * * *." Article 43, section 645 (e). The Commission is empowered to issue bonds to pay the cost of providing water and sewer improvements in any sanitary district and to impose charges for connections with the systems provided, to assess all properties binding on roads in which a water or sewer main has been built and to levy an ad valorem tax on all assessable property within the sanitary district. Article 43, sections 654, 657 and 658.

There are two methods by which a sanitary district may be created under the provisions of Article 43, section 652: (a) by resolution of the Commission with the consent of the governing body of the county; or (b) upon the petition of 25 property owners residing in a locality within the county requesting the Commission to have the locality constituted a sanitary district. The second method is the one used in the present case.

On June 30, 1965, the Commission received a petition signed by more than 25 property owners residing in the Freedom Election District of Carroll County, requesting "to have [the Freedom Election District] constituted a sanitary district for the purpose of providing water and sewerage facilities within

---

1. Article 43, § 649 (a) (Supp. 1966) provides that the powers of a sanitary district are to be exercised by a governing body known as a Commission, which except in Allegany and Garrett Counties, is to be composed of three citizens of the incorporating county, appointed for specific terms by the governing body of such county.

the district." The Commission gave its preliminary approval to the request, and pursuant to the requirements of section 652 (b), engaged an engineering firm—Matz, Childs & Associates—to study the engineering feasibility and probable cost of providing the Freedom Election District with water and sewerage facilities.

Upon completion of the preliminary engineering survey, section 652 (b) directs the Commission to give notice by publication in local newspapers for three successive weeks and by handbills "posted and circulated" in the area of the proposed sanitary district. The notice "shall describe the proposed sanitary district * * *, together with the time and place of hearing to be held, at which hearing a report shall be made as to the then estimated approximate cost of the facilities contemplated and the establishment of a sanitary district" and the amount, if any, to be financed by the issuance of bonds. After this notice and hearing, section 652 provides that the Commission, in its discretion, may sign an order granting the establishment of a sanitary district. The Commission's discretion is not unlimited, but is expressly conditioned: (1) "upon a finding that such establishment * * * is necessary to the public health, safety and welfare of the residents within such new * * * sanitary district," and (2) "upon a finding that such establishment * * * is feasible from an engineering and financial standpoint * * *." Article 43, section 652 (a) and 652 (b). The statute then provides for the publication of the written order of the Commission setting out its determination. The appellants make no claim that the Commission failed to comply in full with these statutory requirements or that these procedures are in any way unlawful, either as written or applied.

The appellants' attack goes solely to that portion of section 652 (b) which provides for *review* of the Commission's order by the County Commissioners. Section 652 (b) further provides:

> "If ten (10) residents and landowners in the area involved in any such order are dissatisfied with the order of the commission, they shall have the right to take and enter within ten (10) days after the first publication of said order, as above provided, an ap-

peal to the governing body or governing bodies of the county or counties in which lies the proposed sanitary district or enlargement thereof who shall review, after due notice of hearing, the commission's decision. If the governing body or governing bodies of said county or counties shall find that the amount of bonds to be issued pursuant to § 654 of this subtitle to pay the costs of installing such facilities and establishing a new sanitary district, together with the unamortized balance of the bonds issued to pay the cost of all facilities previously installed by the commission in the area involved, will not exceed twenty-five per centum (25%) of the assessed property value as fixed for county taxation purposes within said area or locality, and if they find that the proposed project is feasible from an engineering and financial standpoint, and if, in addition thereto, they shall find that it is necessary to the public health, safety and welfare of the residents therein that said sanitary district be established or enlarged, they may in their discretion reverse any decision of the commission denying the petition to create or enlarge a sanitary district. *If such governing body or governing bodies do not so find, they may in their discretion reverse any decision of the commission creating or enlarging a sanitary district."* (Emphasis supplied).

More than 10 residents and landowners in the Freedom Election District filed a petition for appeal to the County Commissioners from the order of the Commission, as permitted by section 652 (b). On July 11, 1966, after the required notice was published, a hearing was held on this appeal at the Sykesville High School. The County Commissioners, on September 6, 1966, affirmed the decision of the Commission constituting the Freedom Election District a sanitary district and made, in writing, the findings required by section 652 (b).

(1)

The appellants' first contend that section 652 (b), above-quoted, is an invalid delegation of legislative authority because

it lacks sufficient guides and standards to be followed by the County Commissioners in exercising the legislative power. We disagree. While the ultimate decision of the County Commissioners rests in their discretion, the criteria which the County Commissioners are to apply in reviewing the action of the Commission are clearly set forth and are numerous:

1. The principal amount of bonds to be issued must not exceed 25% of the assessed property value in the proposed sanitary district.

2. The project is feasible from an engineering and financial standpoint.

3. The establishment of the proposed sanitary district is necessary to the public health, safety and welfare of the residents in the locality to be served.

If the Commission denies a petition to create a sanitary district, the County Commissioners may, in their discretion, reverse that decision and grant the petition if they find the three criteria exist; on the other hand, if the Commission grants the petition, the County Commissioners may, in their discretion, reverse the decision of the Commission if they find that any one or more of the three criteria has not been met.

In our opinion, our decision on this point is controlled by our decision in *Ackley v. Wicomico County Urban Services Comm'n,* 223 Md. 196, 163 A. 2d 122 (1960) in which we sustained the constitutionality of Chapter 287 of the Acts of 1959, creating the Wicomico County Urban Services Commission and delegating certain powers and duties to it. As in Section 652 (b), the Urban Services Commission was authorized, in its discretion, to establish a new district upon the petition of a certain number of property owners residing in the proposed new district. The criteria for the exercise of the discretion were almost identical to the criteria set forth in Section 652 (b), the only difference being in the percentage limiting the cost of all facilities in reference to the assessed property value. The appellants in *Ackley* also argued that these guides and standards were insufficient and that the attempted delegation of legislative power was improper. In sustaining the validity of the legislation, Judge Henderson, for the Court, stated:

"The cases generally recognize that there is no improper delegation, where the discretion conferred is unfettered, even though the power is invoked or initiated upon petition of interested parties. See *Water District No. 1 of Johnson County v. Robb*, 318 P. 2d 387, 398 (Kan.) (1957) ; Note, 70 A.L.R. 1062, 1064. Cf. *Leonardo v. Board of County Comm.*, 214 Md. 287, 304.

\* \* \*

"We find no merit in the contention that there were no adequate standards to guide the Commission in the instant case. In dealing with matters affecting public health or safety, elaborate or detailed guides are unnecessary. Cf. *Givner v. Commissioner of Health*, 207 Md. 184, 191, *Pressman v. Barnes*, 209 Md. 544, 554, and *McBriety v. Mayor, etc. of Baltimore*, 219 Md. 223, 238. We think the standards set up in the Act are adequate." (223 Md. at 203-04; 163 A. 2d at 126).

See also *Truitt v. Board of Public Works*, 243 Md. 375, 385-392, 221 A. 2d 370 (1966).

The Supreme Court of the United States has sustained the sufficiency of guides and standards far less definite than those involved in the present case, and indeed, has sustained Congressional enactments in which guides and standards have been entirely absent. See *Arizona v. California*, 373 U. S. 546 (1963). See also Davis, *Administrative Law Treatise*, sections 2.03 and 2.04.

## (2)

The appellants principally stress the contention that they were denied due process of law because the hearing before the County Commissioners did not provide for cross-examination of witnesses and other procedural safeguards. Counsel for the appellees concede that the proceedings were not conducted as a trial-type hearing, but maintain that the hearing is a legislative one in which the usual procedural safeguards necessary for a judicial hearing are not required. Counsel for the appellants conceded at the argument that the hearing was not the usual

*judicial* hearing, and the *full* safeguards of a judicial hearing were not applicable. The appellants maintain, however, that the nature of the administrative hearing required *more* safeguards than the appellants were afforded, referring us to an interesting article entitled *Some Aspects of Administrative Law in Maryland* by Leonard E. Cohen, 24 M.L.R. 1 (1964).

In our opinion, the hearing required by Section 652 (b) is a quasi-legislative hearing at which legislative facts, as opposed to adjudicative facts affecting the rights of a specific person, are to be explored and determined. When the General Assembly, itself, acts there is no constitutional requirement that there be any hearing. *Union Investors, Inc. v. Montgomery County*, 244 Md. 585, 588, 224 A. 2d 453 (1966).

Where legislative hearings are held, they are generally held before a committee of one of the two houses of the General Assembly after notice has been given of the hearing date with the opportunity to members of the public to appear and be heard during the time allocated for the hearing. Cross-examination, a transcript of the record, objections to testimony and the like are neither required nor usual at such legislative hearings.

Article 652 (b), although requiring a hearing, does not provide for the procedure to be followed by the County Commissioners at the hearing. As the proceeding is quasi-legislative in nature, it is our opinion that the hearing contemplated by section 652 (b) was in the nature of the usual legislative hearing, so that the *constitutional right* of cross-examination and other procedural safeguards, necessary at a judicial or quasi-judicial proceeding where adjudicatory facts are determined, is not present.

The Supreme Court of the United States came to a similar conclusion in *Norwegian Nitrogen Products Co. v. United States*, 288 U. S. 294 (1933) in determining the type of hearing required to be conducted under the flexible tariff provisions of the Tariff Act of 1922 by the United States Tariff Commission in investigating proposed charges in tariff rates. The Tariff Act provided that "the Commission shall give reasonable public notice of its hearings, and shall give reasonable opportunity to parties interested to be present, to produce evidence,

and to be heard." Mr. Justice Cardozo, for the Supreme Court, in sustaining the action by the Tariff Commission, stated:

"The process of tariff-making by Congress and congressional committees is not different in essentials from that for legislation generally. If the bill has gone to a committee, the practice has been general to give the privilege of a hearing to business men and others affected by its provisions. The hearing is not one that may be demanded as of right. * * * In none of these congressional hearings has the practice ever prevailed of permitting the advocates of a measure to cross-examine the opponents, or the opponents the advocates, or of compelling the committee itself to submit to an inquisition as to data collected by its members through independent investigation. * * * What is done by the Tariff Commission and the President in changing the tariff rates to conform to new conditions is in substance a delegation, though a permissible one, of the legislative process. * * * *The inference is, therefore, a strong one that the kind of hearing assured by the statute to those affected by the change is a hearing of the same order as had been given by congressional committees when the legislative process was in the hands of Congress and no one else. To be sure there has been a change of sanction. What was once a mere practice has been converted into a legal privilege. But the limits of the privilege were not meant to be greatly different from those of the ancient practice that had shaped the course of legislation.*" (Emphasis supplied). 288 U. S. at 304-05.

See also Davis, *Administrative Law Treatise,* section 7.20, where it is stated:

"Legislative facts are often best developed through written presentations, or through an argument type of hearing, as distinguished from a trial. The proper method for meeting adverse legislative facts is often written or oral argument; occasionally convenience calls

for rebuttal evidence or cross-examination, but when
the facts are legislative, that is a matter of convenience
and not of procedural right."

It is clear that the General Assembly, itself, can establish a
sanitary district. See *Ackley v. Wicomico County Urban Ser-
vices Comm'n, supra*. See also Acts of 1963, Chapter 706, con-
stituting the whole of Harford County a sanitary district. When
it delegates this legislative function to the County Commission-
ers,[2] their action is a completion of the work which otherwise
could have been done by the General Assembly. *Albert v. Pub-
lic Service Comm'n*, 209 Md. 27, 36, 120 A. 2d 346 (1956).
See 1 Am. Jur. 2d, *Administrative Law*, section 93.

When, however, the General Assembly delegates a legisla-
tive function to an administrative board and provides that a
hearing be held to determine the necessary legislative facts,
that hearing must be held after adequate notice is given and an
opportunity to be heard must be afforded at the hearing. *Bern-
stein v. Board of Education of Prince George's County*, 245
Md. 464, 226 A. 2d 243 (1967).

The allegations in the declaration of the appellants clearly
indicate that adequate notice was given, and that the County
Commissioners afforded the opportunity to everyone to be heard.
The events which transpired at the hearing, by the appellants'
own account, as set forth in the allegations of their declaration,
are as follows:

It was alleged that Horace S. Brauning presided and at the
opening of the hearing stated a petition with 325 names on
it had been filed opposing the establishment of the district; and
a petition in favor with 432 names. Representatives from the
County and State Health Departments were given the oppor-
tunity to make statements which "had to do in a very general
way as to the fact that there was in existence in this area a
serious health problem."

---

2. It should be noted that § 652 (b) contemplates action by the
County Commissioners only when there is an appeal from the de-
cision of the (Sanitary) Commission. If no appeal is taken, the
sanitary district is established "upon the filing of said plat [show-
ing the sanitary district] and the approval of said locality by the
governing body * * * and the Commission."

174

The presiding officer then indicated that the County Commissioners were willing to "listen to the citizens." Counsel for the opponents was granted the floor in order to make an opening statement. He objected "for the record" to "the lack of fully known and set out ground rules, the lack of placing any witnesses under oath, the presence of limitations on cross-examinations or examinations of the Sanitary Commissioners themselves." He objected in advance "to any witness who would present prepared text material without affording the opportunity to examine this material and sufficient time to digest this material so that a proper cross-examination and rebuttal could be made."

The presiding officer then called a representative from the State Health Department, Dr. Shrop, "not as a witness but to tell why this water and sewage [sic] were needed and to be prepared to answer questions from the public only." Leonard Glass, who had signed the letter of transmittal of the Matz, Childs report was called and stated, in short summary, the substance of the written report.

Mr. Short, an attorney who allegedly represented those in favor of the sanitary district, stated that "there was a large group of people in the area who were definitely for it and he would call upon them to express their feelings, whereupon he called on a William Caldwell, Stewart Hurline and Eugene Lipman, who expressed their personal views and were not subjected to cross-examination nor were they put under oath, as also no one before them had been put under oath." Hammond Staley was then called. "He was for it, but allowed to state that 'there were 133 permits for new wells.' "

At this time the opponents were given an opportunity to present their case. James Foley was called "to give a written report of which copies were given to all Commissioners and to their attorneys and the attorney 'for the opposition.' " Billy Heinekamp gave a report "which was completely verbal." Hobey Wolfe "was called upon and he pointed out the needs, the emotions and desires in the area as he had seen it."

After the closing of the presentation by the opponents, the presiding officer "stated that he wished to hear from the public (audience) and make the mike available 'to hear from the citi-

zens, to hear what their desires and questions were and then there was a series of about 20 or 30 citizens making individual reports or asking questions.' "

Not only was the hearing adequate—as indicated by the appellants' allegations—but indeed, the County Commissioners did more than required by section 652 (b); they gave a further hearing on September 2, 1966, so that counsel for the interested parties could summarize their positions.

### (3)

The third contention of the appellants is that two facts, alleged in their declaration, were not refuted in the appellees' motion for summary judgment: (a) that "the sanitary commission, at the first hearing, promised future hearing dates" and (b) that "an unauthenticated $.8 million grant-in-aid of the federal government was considered as evidence, and was nowhere shown to be true; the implication, on the record, is that it was not true."

The actual allegation in Paragraph 7 of the declaration was:

"At this hearing many questions were asked, not all of them were answered. *Answers were promised for future hearing dates.*" (Emphasis supplied).

These contentions and alleged "facts" were neither set forth in the answer of the plaintiffs to the defendants' motion for summary judgment nor mentioned in the affidavit supporting the answer of the plaintiffs to the motion. It is clear that the supporting and opposing affidavits must submit evidentiary facts to the court (*Tri-State Properties, Inc. v. Middelman,* 238 Md. 41, 207 A. 2d 499 (1965), and these "facts" were not submitted in the plaintiff's affidavit.

In the supplementary answers of the defendants to interrogatories, a copy of a letter from the Regional Director of Community Facilities, Department of Housing and Urban Development was attached showing that the $800,000 grant had been approved.

We conclude that the lower court was correct in finding that there was no genuine dispute as to any material fact.

## (4)

Finally, counsel for the appellants did not at the argument press the contention that the advancement of the case on the appeal docket by this Court denied the appellants due process of law. However, as the point was considered in the briefs of the parties and was not clearly abandoned by the appellants, we will consider the matter.

The appellants contend that because of the advancement of the case (a) they did not have adequate time to "properly prepare and brief the subtle and complex questions of this case" and (b) the appeal was advanced without sufficient cause being shown for such advancement.

### (a)

In our opinion, the appellants had ample time to file their brief and appendix or record extract in this case. They waited the full 30 days after the judgment was entered on January 27, 1967, to enter their order for appeal on February 27. The order to advance was signed on March 8, 1967, 9 days after the appeal was entered and gave the appellants until March 27 to file their brief and appendix or record extract. The filing date was 28 days after the appeal was filed. As pointed out above, the brief of the appellants and the joint appendix were actually filed on April 20, 1967, or 52 days after the appeal was entered, and 43 days after the order of March 8 advancing the case. It seems apparent that the appellants had sufficient time to prepare and file their brief and joint appendix.

In any event, the appellants *did* file their brief and the joint appendix within the time ultimately allowed and obviously have suffered no prejudice from the alleged lack of sufficient time.

### (b)

The motion for advancement filed by the appellees recited that the County Commissioners, in their findings and decision of May 6, 1966, had found (based on the advice of Health Department officials) that there was a "need for immediate action in initiating public water and sewerage services in the Freedom Sanitary District area." The only purported reason given in the answer of the appellants in opposition to the motion to advance was that there was a bill pending in the General As-

sembly, which, if passed, would make all of Carroll County a sanitary district and would make the pending appeal moot. The allegations in the motion amply justified the action of this Court in advancing the case for argument. The matter of advancement of cases is within our discretion and, indeed, Maryland Rule 845 (c) provides that this Court may, "upon its own motion," advance the case for argument. In our opinion, we properly advanced this case for argument and properly fixed the times for filing briefs and appendices or the record extract.

*Order affirmed, the appellants to pay the costs.*