# David C. Newcomer vs. Nicholas Orem.

Where there is no express marriage contract the law of the matrimonial domicil governs as to all the rights of the parties to their present property in that place, and as to all personal property everywhere.

As to immoveable property the law *rei sitæ* prevails, and where there is no change of domicil, the same rule applies to future acquisitions as to present property.

It is well established that the right and succession to personalty must depend on the law of the domicil: but the law of the place where the property is found must be appealed to, in determining whether it is moveable or immoveable.

A testator died in Louisiana in 1833, and by his will directed his executors to keep his estates, real and personal, together for three years, and then sell and dispose of the same. In 1837, his estate was sold by a parish judge of said State under an order of the probate court, and the notes of the purchaser secured by a mortgage on the property, were divided among the parties entitled to the succession. HELD, that this sale and the division of the notes, effected a conversion of the estate from realty to personalty.

In this State under a commissioner's sale, the mutation from realty to personalty is complete when the sale is ratified and the purchaser has complied with the terms of it, by paying the money if for cash, or by giving bonds to the representatives, if the sale is on credit.

One of the parties interested in the succession in this case, was a resident of Maryland, and in 1836 she married the appellee, who was also a resident of this State, and both continued to reside here until the death of the wife in 1844. HELD:

That the property having been converted from realty to personality by the sale and division of the notes in 1837, the interest of the wife in the property, ceased to be governed by the laws of Louisiana, and became subject to those of their domicil, by which the husband is the owner of the wife's *choses in action*, subject to the right of survivorship.

By the laws of Louisiana, obligations for the payment of money though accompanied by mortgage are moveable, and there is no provision in those laws by which debts originating in any source are made the subject of *real laws.*

A debt is not a *corpus* capable of local position, but is purely a *jus incorporale*, and it attaches to the person of the creditor, though its payment is secured by an hypothecation upon immoveable property.

The mortgage given to secure a part of the notes, for the purchase money at the sale in 1837, was foreclosed in 1841, and the property bought in the name and for the heirs of the testator, including the wife of the appellee, the latter taking no interest or estate in the property so purchased. It so

38 v. 2

remained, the parties interested, including the wife of the appellee, receiving their respective portions of the rents, up to her death in 1844.  HELD:

That this property being real and having been purchased in the name of the heirs including the wife of the appellee, in her life time, the rents and income since her death must go to her brothers and sisters and not to the appellee as surviving husband.

Another mortgage given to secure the other portion of the notes for the purchase money at the sale in 1837, was not foreclosed until 1846, after the death of the wife of the appellee, and this property was also purchased in the name and for the heirs of the testator, and afterwards resold, and a portion of the proceeds invested in another estate in Louisiana.  HELD:

That as the notes for the sale in 1837, belonged to the appellee in right of his wife, he was entitled to the proceeds when the sale was made, and the reinvestment of a part thereof in another estate, must also enure to his benefit.

Since the repeal of the "*fuero real*" in the year 1828, there is no community of acquests and gains, between husband and wife, as to property found in Louisiana, at the dissolution of the marriage, unless the parties reside there.

There is no article in the code of Louisiana or decisions of the courts of that State, which declares that the law regulating paraphernal property is *real*, or exempts it from the general rule of public law, subjecting personalty to the control of the law of the domicil.

APPEAL from Talbot county court.

This was an action of *assumpsit* instituted on the 16th of May 1846, by the appellee against the appellant.  The declaration contained the usual *indebitatus assumpsit* and the common money counts.  The defendant pleaded *non assumpsit*, and the case was submitted to the court below on a statement of facts in substance as follows.

William Blunt of the State of Louisiana died in June 1833, leaving a large real and personal estate, also a last will and testament, dated the 28th of January 1833, by which he directed that after all his debts were paid his executors should "keep all my property real and personal together, for the space of three years after my decease, and at or after that period to sell and dispose of it in the best possible manner, if they deem it advisable for the benefit of the estate."  And after several bequests of specific legacies the will proceeds.  "I give to my sister Ann H. White, the heirs of James Ringgold Blunt,

and the heirs of my late sister Sarah Bryan, the remainder of my estate wheresoever and whatsoever in America and England," and appointed Frederick Bryan and William B. Lintot his executors. This will was admitted to probate in August 1833.

James Ringgold Blunt was a deceased brother of the testator, having died in the State of Maryland, leaving seven children who were his heirs at law at the time of the death of the said William Blunt, including Maria Blunt who intermarried with Orem the plaintiff, in June 1836, in Talbot county, Maryland, where they now reside and always have resided. The executors of William Blunt, assumed the administration of his estate in Louisiana, and in 1834, one John Harper was duly and legally appointed by the heirs of the said James R. Blunt, and by the said Mrs. Ann White, their agent and attorney, to take all necessary and legal steps in the State of Louisiana, to collect and receive for them from the executors of said William Blunt, their respective proportions of his estate under his will, and to take all necessary steps for their better security in the premises. In the fall of 1834, said Harper proceeded to Louisiana, and on his application to the court of probate in the parish of Concordia, the power of the executors under the will of William Blunt, was revoked, and one Tenney was appointed curator of the estate, and on the 6th of January 1837, inventories and appraisements of said estate were returned to said court. The inventory and appraisement of the estate, real and personal, in the parish of Concordia, called the "Wakefield Plantation," amounted to $98,332.25, and that in the parish of Catahoula called the "Home Estate," to $73,652.25.

On the 13th of February 1837, the estate in the parish of Concordia, consisting of land, negroes, stock and farming utensils, was sold at public sale by the parish judge, under a decree of the probate court of said parish, to one James McIntosh Williams, for the sum of $218,000, who paid $10,000 in cash, and the residue in drafts and negotiable notes, payable to the heirs of the succession of said Wm. Blunt, secured by mortgage of the property to the heirs of the succession of

William Blunt, and on the same day the same judge by virtue of the same authority, also sold at public sale, the Catahoula estate, also consisting of land, negroes, stock and farming utensils, to one Josias Armstrong Lyle, for $175,000, of which the purchaser paid $10,000 in cash, and the residue in drafts and negotiable notes, payable as above, and also secured by a mortgage on the property to the heirs of the succession of William Blunt. The said Harper and David C. Newcomer, agents in fact of the testamentary heirs of the said William Blunt, were present, and for their principles assented to said sales, and became parties vendors thereto, and the said promissory notes to the amount of the interest of the said heirs of the said James Ringgold Blunt were then delivered to and received by the said Harper as their agent and attorney. The said real estate consisting of land, sold for $182,086, the other estate, (real by the laws of Louisiana,) consisting of negroes, for $175,658, and the residue of said estate, being personal, for $35,255.

John A. Lyle, the purchaser of the Catahoula estate, died in 1840, insolvent and unable to pay the purchase money. His mortgage was foreclosed, and the said estate was sold on the 16th of February 1841, and purchased by David C. Newcomer, the defendant, in the name and for the heirs, devisees and legatees of the said William Blunt, by virtue of authority to him, duly given by the said heirs, devisees and legatees, and their respective husbands, including Orem, the plaintiff. Williams, the purchaser of the Concordia estate, made partial payments on his purchase, besides the cash payment of $10,000, but a large amount remaining unpaid, the mortgage was foreclosed, in January 1846, and the said estate was then sold and purchased by the said Newcomer for the heirs of the said William Blunt, under the same authority under which the Catahoula estate was purchased.

The Concordia estate was afterwards, and subsequent to the death of the plaintiff's wife, sold by the said Newcomer, to one John A. Sanderson, for the sum of $30,000, and with $15,000 of the said proceeds of sale, the said Newcomer purchased another tract of land in the parish of Catahoula, in

the name and for the heirs of the said William Blunt, by virtue of a power of attorney to him granted for such purpose, by the said heirs, devisees and legatees, and their respective husbands, including the plaintiff.

Maria, the wife of the plaintiff, Orem, died in 1844, never having had issue of her body, leaving her said husband and her six brothers and sisters surviving her, except one Mrs. Adams who had previously died, leaving lawful issue. The proceeds of said estate of William Blunt received for rent, and to which the wife of the plaintiff was entitled in her lifetime, were duly paid over to him and her.

There is now in the hands of the defendant, on deposit in Baltimore, the sum of $2572.38, to which the legal representatives of the deceased wife of the plaintiff are entitled as their share of the proceeds of real estate. The sum of $533.41, part thereof, consists of the proceeds of sale of the Concordia estate, which came to defendant's hands after the death of the wife of the plaintiff, which said estate was sold subsequent to her death. The residue of said sum is the rent and income of the estate in the hands of the defendant, as agent for the heirs, devisees and legatees of said William Blunt. There is also another sum of $200 arising from the same sources, which came into the hands of the defendant, but which, by the direction of those interested, other than the plaintiff, he has not brought into this State, but has retained in Louisiana. All other money which at any time came to the hands of the defendant as agent as aforesaid, to which the wife of the plaintiff was entitled, was paid over to her and the plaintiff.

It was agreed, that if upon the above statement of facts, the court should be of opinion that the plaintiff is entitled to all or any part of the said sums of money in right of his deceased wife, judgment should be rendered accordingly, otherwise for defendant. It was also agreed, that the counsel in their arguments, and the court in considering the cause might refer to and use the printed and published laws of Louisiana, in the same manner and with like effect as if the same were regularly incorporated into this statement of facts.

The court rendered a *pro forma* judgment in favor of the plaintiff for $20,000, the damages laid in the declaration, and interest and costs. From this judgment the defendant appealed.

The cause was argued before LE GRAND, C. J., MASON and TUCK, J.

*McLean* and *Alexander* for the appellant. There was, of course, error in the judgment below, under any circumstances, it being for the debt laid in the declaration instead of the sum admitted by the facts in the hands of the defendant.

The statement of facts shows that Harper acted under an authority from Maria Blunt with others, before she married the plaintiff. That her interest in the notes taken by Harper as the proceeds of the sale of William Blunt's estate was never charged or ascertained, and in the absence of any acts of ownership by Orem over it, (her interest,) proceedings were had to sell the Catahoula estate to pay said notes, and *that estate* was bought by the defendant for the *heirs, devisees and legatees of William Blunt* in 1841; and this was done by virtue of a power derived from the plaintiff Orem, and his wife, with others. In like manner proceedings were had to sell the Concordia estate, which was also bought by defendant for the *heirs, devisees and legatees of Wm. Blunt.* The plaintiff's wife died in 1844. He never exercised ownership over the notes taken and held by Harper on account of the proceeds of *this estate.* In the year 1846, by virtue of proper authority, in which Orem and his wife joined in her lifetime, *this estate* was bought by defendant for the *heirs, devisees and legatees of Wm. Blunt.* In this condition it was subsequently sold by defendant after the death of Mrs. Orem, by virtue of a proper authority derived from her in part, in her lifetime, in which the plaintiff below, her husband, joined, and another estate was bought by him for the same heirs, devisees and legatees of Wm. Blunt. The funds in the hands of the defendant are the proceeds of this last sale, and of rents of the

estates in his hands in trust for the heirs, devisees and legatees of Wm. Blunt. The appellee, the plaintiff below, is not entitled to any part thereof, because:

1st. The said plaintiff had no interest in the estate or estates from which they arose, as he, at no time acquired a separate right in the funds with which they were bought. 1*st. Wm's on Executors*, 556. 1 *Roper's Baron and Feme*, 202 *to* 208. Mrs. Orem's interest in the notes in the hands of Harper was unascertained. The estates sold for $393.000. It was divided into three branches after paying debts, legacies and costs of administration. The part which went to the Blunts, of this whole sum exclusive of debts, &c., was $131.000. Mrs. Orem's part or share of this, in the same way, was one-seventh, which amounts to $18.714. The lowest denomination of notes given for the purchase money was $20.000.

2nd. If he did acquire such right to the funds, he consented to their reinvestment for the benefit of Blunt's devisees and legatees, among whom was his wife, not the appellee.

3rd. The proceeds of land remaining in the hands of the agent before delivery, are to be treated as land, and as such they remained in the hands of Harper, and as such they were invested in the estates in the hands of the appellant. 1 *Barn. and Cres.*, 364. 9*th Do.*, 489.

4th. The laws of Louisiana governs this case, and by them the heirs of Mrs. Orem, being her brothers and sisters, are entitled to these funds. *Louisiana Code, articles* 883, 889, 908, 911, 918, 461, 463, 2314, 2315. 7 *Louisiana Reports*, 294, 295. 3*rd Do.*, 232, 233. 17*th Do.*, 299. 10*th Do.*, 254. 13*th Do.*, 183. 14 *Louisiana* 22, *Hooke vs. Hooke. Condensed Reports of Louisiana*, 617. *Digest of Louisiana Rep.*, 278. *Story's Conflict of Laws, sec.* 371.

*Nelson* for the appellee, made the following points:

1st. That the laws of Maryland and not the laws of *Louisiana*, control and govern the rights of the appellee in this case. *Story's Conflict of Laws, secs.* 481, 482, 483. 2 *H. & J.*, 191, *De Sobry vs. De Laistre. Story's Conflict of Laws*,

*sec.* 145.  3 *Johns. Ch. Rep.*, 211, *Decouche vs. Savetier.*  2 *Kent's Com.*, 458, 459.  8 *Paige*, 261, *Le Breton vs. Miles. Story's Conflict of Laws*, secs. 158, 159, 170.  17 *Martin,* 599, *Saul vs. his creditors, also reported in* 3 *Louisiana Condensed Reports.*  8 *Louisiana Reports*, 544, *Hick's admrs. vs. Pope.*  9 *Robinson's Louisiana Reports*, 438, *Succession of Packwood.*  7 *Louisiana Condensed Reports*, 744, *Ford's Curator vs. Ford.*  4 *Louisiana Condensed Reports*, 146, 188.

2nd.  That the estate of William Blunt, the testator, from the period of his death, is to be considered and treated as personal estate, and as such the share or proportion of *Maria Orem* vested absolutely in her husband, the appellee.  2 *Louisiana Cond. Rep.*, 168, *Bryon and wife, vs. Moore's heirs.*  3 *Wheat.*, 563, *Craig vs. Leslie.*  4 *Louisiana Cond. Rep.*, 331.  16 *Louisiana Rep.*, 146, *Davidson vs. Stewart, et al.*  6 *Pet.*, 291.

3rd.  That if the estate of William Blunt is not to be regarded as personal estate, from the time of his death, it became so from the date of the sale thereof by the parish judge of Concordia, and as such, the share or proportion of Maria Orem, vested absolutely in her husband, the appellee.  1 *H. & G.*, 88, *Hurtt vs. Fisher.*  6 *H. & J.*, 31, *State vs. Krebs.*  6 *H. & J.*, 156, *Stevens vs. Richardson.*  1 *H. & G.*, 267, *Leadenham vs. Nicholson.*  2 *G. & J.*, 81, *Hammond vs. Stier.*  3 *G. & J.*, 96, *Glasgow vs. Sands.*  6 *G. & J.*, 507, *Spence vs. Robins.*  12 *G. & J.*, 85, *Hatton vs. Weems.*  1 *Bland*, 475, *(note,) Spurrier vs. Spurrier.*  Act of 1898, chap. 101.

4th.  That the share or proportion of Maria Orem of the estate of William Blunt, was actually reduced into possession by the appellee in the lifetime of Maria Orem, and that any reinvestment of the proceeds thereof, was for the sole use and benefit of the said appellee.

TUCK, J., delivered the opinion of this court.

It is a material fact in this cause, that the appellee and his wife were married, and always resided in Maryland, as his rights, in a great degree, depend on the law of their domicil. A statement of the principles applicable to such questions, will

serve to guide us in tracing and defining the interest of Mrs. Orem in William Blunt's estate, down to the commencement of this suit. "Where there is no express marriage contract, the law of the matrimonial domicil will govern, as to all the rights of the parties to their present property in that place, and as to all personal property every where, upon the principle, that moveables have no *situs*, and, that they accompany the person. As to immoveable property, the law, *rei sitæ*, will prevail. Where there is no charge of domicil, the same rule will apply to future acquisitions, as to present property." *Story's Confl. of Laws, secs.* 186, 187. And it is, also, a well established principle, that the right and succession to personalty, must depend on the law of the domicil. But the law of the place where the property is found must be appealed to, in determining whether the estate in question is moveable or immoveable. That being settled, the former passes according to the law of domicil, and the latter according to the *lex rei sitæ*. *Ditto, secs.* 447, 481, 482, 483.

If, therefore, any part of the fund in controversy was personal at the death of Mrs. Orem, and was not affected by any real law of the State of Louisiana, that is to say, by any law operating upon property, which is the distinction there made, (whether the property be real or personal,) the plaintiff below must recover in respect to such portion.

It is unnecessary to inquire, whether the direction in the will of William Blunt, for the sale of the property, effected a conversion or not; because in our opinion, that change took place by the sales in 1837, and the division of the notes of the purchasers among the parties entitled, if not before. The counsel for the appellant relies on the case of *Hooke vs. Hooke,* 14 *Louisiana,* 22, to show, that such effect was not produced by these proceedings in the present case. The cases are parallel down to the receipt of the notes, by the officer making the sale. But in the one cited, either the notes or the money was brought into court, and at the time the question arose were undivided. And the court said: "The licitation to effect a partition, although it vested the title in the purchaser, was not a sale as between the heirs; it was merely one of the acts of

39      *v.*2

partition. That act did not change the nature of the property to be divided; and as the children of the first marriage died while that property still remained in a state of indivision, the rights of the defendants were the same as if no licitation had taken place." The question there was, whether the shares of two of the heirs who had died in another State pending the proceedings, should descend according to the law of their domicil, or according to that of the place where the real estate was located. The latter law was allowed to prevail, because the fund was immoveable, not having been divided. But this case is different. The statement shows that the heirs and devisees of William Blunt, by their agent, were present at, and became parties vendors to, the sale, and that the heirs of James R. Blunt received, by their agent, their shares of the proceeds of sale, in the notes of the purchasers, which were secured by mortgages on the estates. This sale and receipt of notes, changed the legacies into personal demands against the purchasers. It was decided in the case of *State vs. Krebs,* 6 *Har. & Johns.,* 31, that under a commissioners' sale in this State, "the mutation from realty to personalty may be determined to be complete, when the sale is ratified and the purchaser has complied with the terms of it by paying the money, if for cash, or by giving bonds to the representatives if the sale is on credit;" and that such bond, passed to a wife, is a *chose in action.* The notes in this case were made "payable to the heirs of the succession of William Blunt," and the heirs of James R. Blunt taking *per stirpes,* received notes to the amount of their interest. We suppose that a ratification of the sale cannot be necessary, when the sale is made by the parish judge himself, and not by commissioners or a trustee, as in this State.

     The property having undergone this change, we are of opinion, that the interest of Mrs. Orem ceased to be governed by the laws of Louisiana, and became subject to those of their domicil, by virtue of which, the husband is the owner of the wife's *choses in action,* subject to the rights of survivorship. This appears to be consistent with the decision in the case of *Packwood's Succession,* 9 *Robinson,* 438, where a wife re-

moved to New York, after having acquired an interest in the
community of *acquests and gains* during her residence in
Louisiana.   She died in New York, and the court held that
the price or value of her share of the community, which her
husband had sold during her lifetime, was a debt due from the
husband to her estate: but that it was due to her in New York
and not in Louisiana, and could not be administered as part of
her estate in Louisiana, because it attached itself to her, at her
domicil, and was distributable according to the laws of New
York.   It had been merged in a debt which was subject to
the controlling influence of the laws of their common domicil.
In contemplation of law, it was not in Louisiana at the time
of Mrs. P's death.   If a crop raised on the property belonging
to the community had been on the place unsold, it may have
been likewise common; but its proceeds in money could not
be put down as part of her estate to be administered in Louis-
iana.   It must be remembered, that by the laws of that State,
those which govern and regulate the community of acquests
and gains, are considered real laws.   And yet, in the case
quoted, the proceeds of the crop were not considered as real or
immoveable, because the moment their identity was merged in
a debt, the right to the debt was governed by the law of the
State where the creditor resided.   And so in the case of *Hicks'*
*Adm'r vs. Pope,* 8 *La.,* 554, where a married woman, residing
in Louisiana, became entitled to a negro in Alabama by the
death of her father, it was held, that the question of property
as between the husband and wife, was to be settled by the
laws of their domicil.   This was said to be a necessary conse-
quence of the doctrine, "that *in domicilii loco mobilia intelli-
guntur existere.*"

We do not find any thing in the code that regulates the
conversion of estates; but it would seem by *Art.* 466, that
obligations for the payment of money, though accompanied
by mortgage, are moveable.   No distinction appears to have
been drawn between obligations arising from transactions in re-
gard to moveables and immoveables; nor any provision intro-
duced, by which debts, originating in any source, are made
the subject of real laws.   Justice Story says, *sec.* 399, *Confl.*

*Laws:* "In fact, a debt is not a *corpus,* capable of local posi-tion, but purely a *jus incorporale.*" And he quotes, with approbation, from *Livermore's Dissertations* a passage, illus-trative of these principles: "It was formerly doubted by some, whether personal actions should be considered as moveable, and whether they should not be considered to have a location in the domicil of the debtor. But the common opinion seems to be well settled, that considered actively and with respect to the interest of the creditor and his representatives, they must be considered as attached to the person of the creditor; and this although the payment of the debt is secured by an hypotheca-tion upon an immoveable property."

Having shown, as we think, that the interest of Mrs. Orem in William Blunt's estate became a debt against the purchasers, and that that debt immediately attached itself to the person of her husband, as an incident of the marriage, let us next inquire how it stood at the commencement of this suit. In 1841, the mortgage on the Catahoula estate was foreclosed, and the pro-perty bought in the name and for the heirs of William Blunt, including Mrs. Orem. It nowhere appears, that the plaintiff took any interest or estate in the property so purchased. In this condition it has remained, as far as we are informed, until this time; the parties entitled, including Mr. and Mrs. Orem, receiving their respective shares of the rents and income, up to the period of her death in 1844. This property being real, and having been purchased in the names of the heirs, includ-ing Mrs. Orem, in her lifetime, we are of opinion, that the rents and income since her death must go to her brothers and sisters, and not to the plaintiff as surviving husband, *Art.* 908, 918.

The statement of facts, however, leaves the other estate, or rather the notes received on the sale of the Concordia estate, in a different predicament. Mrs. Orem died in 1844. The mortgage on this estate was foreclosed in 1846, and the prop-erty purchased in the name and for the heirs, and afterwards resold for $30,000; fifteen thousand of which were invested in another estate. If this debt belonged to the plaintiff in right of his wife, as we suppose, he was entitled to the proceeds of

sale when the claim was realized by a sale of the property, and, the money or proceeds being his, the investment of part thereof in other estate, must, also, enure to his benefit. The plaintiff is, therefore, entitled to judgment for $533.41, for proceeds of sales of this estate made to Sanderson. We do not award him any part of the sum said to be in hand for rents and income; because that amount must have accrued from the land that was sold to Lyle, and afterwards purchased for the heirs, in 1841. The Concordia estate was not sold until January 1846; this suit was commenced in May of that year, and it is not probable that any rents or income had then been received from the land that was purchased by a part of the proceeds of said sales.

The disposition of the sum of $200, said to have "arisen from the same sources," would depend on the principles heretofore stated, if we could determine how much was received from the sales of the Wakefield property, and what amount on account of rents and income of the Hope estate. In the absence of distinct averments on these points, we do not embrace that sum in our judgment.

In the examination of this case we have considered it as unaffected by the argument of the counsel, in reference to the regulations of the code upon paraphernal and community property. The cases referred to by the appellee's counsel, do not apply to one like the present. *Saul vs. His Creditors*, 3 *Cond. Rep.*, 663, and *Coles' Widow, vs. His Executor*, 4 *Do.*, 146, were decided upon marriages contracted while the *Fuero Real*—a law of Spain—was in force. Under this law it was immaterial where the parties to the marriage resided. But it was repealed in 1828, since which there is no community of acquests and gains, between husband and wife, as to property found in that State, at the dissolution of the marriage, unless the parties reside there. *Dixon vs. Dixon*, 4 *La.*, 188. *Note to* 4 *Cond. Rep.*, 148.

And, as to paraphernal estate, we do not find any article in the code, or decision, which declares that the law regulating such property is real, or exempts it from the general rule of public law, to which we have referred, which subjects person-

alty to the control of the law of the domicil. If the parties to the marriage had resided in Louisiana, the case, probably, would have been subject to a different conclusion; but in a case like the present, her laws cannot have any extra-territorial influence over personal estate.'

The discussion of the principles involved in the cause was attended with great embarrassment, in consequence of the difficulty of expounding the laws of another State, so different from our own. But we think that the conclusions to which we 'have arrived, are warranted by the code, and adjudged cases of that State, and the acknowledged rules of public law applicable to such questions.

> *Judgment reversed, and judgment for the appellee*
> *for* \$533.41, *and interest from May* 16*th*, 1846,
> *and costs, to the appellant in this court.*