# HOFFMAN CHEVROLET, INC. *v.* WASHINGTON COUNTY NATIONAL SAVINGS BANK

[No. 13, September Term, 1982.]

*Decided November 23, 1983.*

The cause was argued before Murphy, C. J., and Smith, Eldridge, Cole, Davidson and Rodowsky, JJ.

*Donald E. Beachley,* with whom were *Miller, Miller & Oliver* on the brief, for appellant.

*David K. Poole, Jr.,* for appellee.

Cole, J., delivered the opinion of the Court.

In this case, we must determine whether a check from a retirement trust payable to a debtor was properly garnished from the debtor's former employer to whom the check had been mailed. We also are called upon to determine whether the trial judge properly granted summary judgment in favor of the garnishor, attaching the check and funds the garnishee owed the debtor, despite claims that the garnishee was entitled to offset these funds against its obligation as surety for the debtor's obligation to another bank.

Washington County National Savings Bank (Washington Bank) held two notes issued by Victor McSherry, formerly an employee of Hoffman Chevrolet, Inc. The notes being in default, Washington Bank entered two confessed judgments in the Circuit Court for Washington County against McSherry. Washington Bank also requested that the clerk "issue an attachment by way of execution on the rights and credits of Victor H. McSherry, Jr., in the hands of Hoffman Chevrolet, Inc., 101 S. Edgewood Drive, Hagerstown, Maryland." On November 28, 1979, the clerk issued this writ commanding Hoffman Chevrolet "to attach, seize, take and safe keep, the lands, tenements, goods, chattels, and credits" of McSherry. An identical attachment was issued on February 7, 1980. Hoffman Chevrolet, as garnishee, filed answers to both attachments. In response to the first writ, it asserted that McSherry's last pay check had been applied to an outstanding indebtedness to the Hagerstown Trust Company on which Hoffman Chevrolet and McSherry were jointly and severally liable. The answer to the second writ stated that Hoffman Chevrolet had applied all McSherry's funds to satisfy McSherry's debt to Hoffman.

Washington Bank served interrogatories on McSherry and took the deposition of John W. Martin, Hoffman Chevrolet's office manager. The deposition disclosed that Hoffman Chevrolet held $677.84 in McSherry's undrawn commissions and $206.70 in earmarked pension deductions not yet sent to the National Automobile Dealers Association (NADA) Retirement Trust. The deposition also revealed that after the termination of McSherry's employment at Hoffman Chevrolet, McSherry applied to the NADA Retirement Trust requesting payment of benefits to which he was entitled.[1] The NADA Retirement Trust mailed a check, payable to McSherry, in the amount of $8,736.63 to Hoffman Chevrolet.

Martin also elaborated on the indebtedness to which Hoffman's answers to the writs of attachment referred. On June 29, 1979, Hoffman Chevrolet apparently co-signed with Mr. and Mrs. McSherry a security agreement with the Hagerstown Trust Company in the original amount of $22,347.60, the stated collateral being a 1979 Winnebago Motor Home. Martin testified that when McSherry applied for the funds from the Retirement Trust, he stated that he would apply the money to this note. He agreed to meet Martin at the bank and sign over the check. Although McSherry missed this meeting, Hoffman Chevrolet turned the check over to the Hagerstown Trust representative who took it to McSherry's new place of employment and got him to sign it over to reduce the balance on the Hagerstown Trust loan.

Washington Bank filed a motion for summary judgment. Hoffman Chevrolet answered, alleging that McSherry was indebted to the garnishee in an amount exceeding the unpaid commissions and unremitted pension deductions and that McSherry's retirement plan benefits were not even attachable. The trial court granted summary judgment in

---

1. The NADA Retirement Trust pension plan was funded by contributions from the employer and employee. Upon termination of employment, the plan provides that a participant is entitled to the return of his contributions and a certain percentage of the employer's contributions credited to his account.

favor of Washington Bank for $9,621.17 (the sum of all disputed amounts). On appeal, the Court of Special Appeals rejected Hoffman Chevrolet's arguments that: (1) the spendthrift provisions of the NADA Retirement Trust protected the check issued to McSherry from attachment by ordinary creditors until actually received by McSherry, and (2) there was sufficient evidence in the record to create a genuine dispute as to Hoffman Chevrolet's setoff claim. *See Hoffman Chev. v. Wash. Co. Nat'l Sav.,* 50 Md. App. 594, 439 A.2d 50 (1982). We granted certiorari to consider whether the check was attachable and whether summary judgment was properly granted as to any of the amounts attached. Because the amounts at issue raise different legal issues, we shall address them separately.

## I

The threshold question regarding the $8,736.63 NADA Retirement Trust check is whether this check was even attachable. The check did not represent any debt the garnishee owed McSherry, and Hoffman Chevrolet had no real interest in the check. Hoffman Chevrolet simply was acting as a mail drop for the convenience of its former employee and the Retirement Trust. On the surface, this is not the typical garnishment situation. We look then to the relevant statutes and case law to determine whether the check was attachable under Maryland law.

A garnishment proceeding is simply an attachment against defendant's property, or a right thereto, held by a third person — the garnishee. *See Fico, Inc. v. Ghingher,* 287 Md. 150, 159, 411 A.2d 430 (1980); *see generally* 6 Am. Jur. 2d *Attachment and Garnishment* §§ 2-3 (1963). The relevant Maryland statutes and rules state that a court may issue an attachment against a debtor's (1) property or (2) credit, matured or unmatured. *See* Md. Code (1974, 1980 Repl. Vol.), §§ 3-301 and 3-305 of the Courts and Judicial Proceedings Article; Md. Rules 622 a and 623. Therefore, the check must qualify under one of these categories in order to be attachable.

The Court of Special Appeals concluded that "[t]he check in the instant case constituted a credit in the hands of the garnishee belonging to McSherry and was, therefore, subject to attachment." *Hoffman Chev. v. Wash. Co. Nat'l Sav., supra,* at 598. However, our examination of the meaning of the term credit as used in this statute indicates that this conclusion was incorrect.

Although this Court previously has not specifically defined a credit, we note that we have examined cases in which credits have been attached. For instance, in *Northwestern N. Ins. v. Wetherall,* 267 Md. 378, 298 A.2d 1 (1972), Wetherall laid a writ of attachment in the hands of Northwestern. Subsequently, the debtor filed suit against Northwestern to obtain payment under a fire insurance policy. The Court observed "there can be no doubt that monies owed by the garnishee on a judgment are subject to attachment as 'credits. . . .' " *Id.* at 385. We believe that this language suggested the proper meaning of the term credit as it is used in the attachment statute — a monetary obligation that the garnishee owes the debtor. Other sources agree that "credits" is "[a] term of universal application to obligations due and to become due." *Black's Law Dictionary* 333 (5th ed. 1979) (citing *Colbert v. Superior Confection Co.,* 154 Okla. 28, 6 P.2d 791, 793 (1931)); *see also State v. Woodman,* 26 Mont. 348, 67 P. 1118, 1120 (1902). In fact, "credits" and "debts" are correlative. *See McCollum v. Hamilton Nat. Bank,* 303 U.S. 245, 58 S.Ct. 568, 82 L.Ed. 819 (1938); *Libby v. Hopkins,* 104 U.S. 303, 26 L.Ed. 769 (1881); *Kansas City Life Ins. Co. v. Hammett,* 177 La. 930, 149 So. 525 (1933); *Wilde v. Mahaney,* 183 Mass. 455, 67 N.E. 337 (1903). Thus, an attachable "credit" is a monetary obligation that the garnishee owes the debtor. For instance, in this case, Hoffman Chevrolet held $677.84 in McSherry's undrawn commissions — a debt the garnishee owed the underlying debtor. These funds were garnishable credits. However, the check was not a credit, because it did not represent an obligation that the garnishee owed the debtor. Rather the check was a representation of an obligation owed by the NADA Retirement

Trust to McSherry. Washington Bank could not reach this obligation by the writ of attachment laid in the hands of Hoffman Chevrolet.

Cases from other jurisdictions support this conclusion. In *Morse v. Stevens,* 95 Vt. 465, 115 A. 697 (1922), promissory notes payable to the defendant or bearer had been transferred by the defendant to a third person. The defendant's creditor laid a writ of attachment in that person's hands and asserted that the notes were attachable "goods, effects or credits." The court concluded that the notes were not attachable credits and that the garnishee would not be charged "on the ground of having in his hands mere securities for money belonging to the principal debtor." *Id.* at 697. These notes represented the obligations of another — not the garnishee. *See also Hancock v. Colyer,* 99 Mass. 187 (1868).

Although the check did not qualify as an attachable credit, we must, nevertheless, determine if the check was otherwise attachable. The Court of Special Appeals did not consider whether the check was the debtor's property and thus whether it qualified under that aspect of the attachment statute. We pause then to examine the history of Maryland attachment law and the common understanding of certain terms in resolving this issue.

In the Acts of Assembly, of the Province of Maryland for the year 1715 appears "An Act directing the Manner of Suing out Attachments in this Province, and limiting the Extent of them." This Act permitted attachment of the defendant's "Goods, Chattels, and Credits." This provision was expanded in 1732 when Parliament enacted the Statute of 5 Geo. 2 Ch. 7, "An Act for the more easy Recovery of Debts in his Majesty's Plantations and Colonies in America," which added the defendant's "Houses, lands, . . . and Real Estates towards the satisfaction of such Debts. . . ." Therefore, real property was made "subject to the same remedies, proceedings and process in any Court of Law or Equity that personal estates are under the Act of 1715, Chapter 40." Gomborov, *Attachment in Maryland* 89 (1926). This expansion of the attachment law was retained in

Maryland after the Declaration of Independence, because in the 1778 Laws of Maryland, ch. IX, § VI "lands and tenements" were added to the list of things susceptible to attachment. By 1859, the attachment law had again been revised to provide that: "Any kind of property or credits belonging to the defendant, in the plaintiff's own hands, or in the hands of any one else, may be attached; and credits may be attached which shall not then be due." [2] *See* 1859 Revised Laws of Maryland, Article X, § 11. In the Public General Laws of 1888, this provision was placed in Article 9, § 10, where it remained unchanged until 1962. Later, with the codification of the Courts Article, *see* 1973, 1st sp. sess. Md. Laws, ch. 2, § 1, the provision was amended to provide: "An attachment may be issued against any property or credit, matured or unmatured, which belong to a debtor." [3] This is the present form of this section. *See* Md. Code (1974, 1980 Repl. Vol.), § 3-305 of the Courts and Judicial Proceedings Article.

Despite our research, we have found no concrete indications of the intended meaning of this language. Nevertheless, we shall determine whether a check should be included under the general term "property" in this provision of the attachment law.

Current commercial law defines the term "check" as "a draft [and order] drawn on a bank and payable on demand." Md. Code (1975), § 3-104 (2) (a) & (b) of the Commercial Law Article. "A draft . . . [is] an open letter of request from, and an order by, one person on another to pay a sum of money

---

2. We note that the writ in this case commanded Hoffman Chevrolet "to attach, seize, take and safe keep, the lands, tenements, goods, chattels, and credits" of McSherry. However, we have found no indications that any substantive change was intended by the legislature in shortening the description of lands, tenements, goods and chattels to the general term property. In fact, Gomborov provides a sample "Writ in Attachment under Act of 1888" with the following operative language: "That YOU attach the lands, tenements, goods, chattels and credits of the said . . . ." Gomborov, Attachment in Maryland 104 (1926). Thus, we view the change in the law affected in 1878 as one of form rather than substance.

3. The Revisor's Note to this section states that: "This section is new language derived from Art. 9, § 1 and applies to an attachment on original process as well as on a judgment or decree."

therein mentioned to a third person on demand or at a future time therein specified." 11 Am. Jur. 2d *Bills & Notes* § 14 (1963). The two distinguishing features of a check under the former Negotiable Instrument Law and the current Uniform Commercial Code "are that they are drawn on a bank and payable instantly on demand." *Id.* § 16. It is apparent from an examination of the definition of a "check" in *Bouvier's Law Dictionary,* that the meaning of this term has not changed substantially in the last century and a quarter: "A written order or request, addressed to a bank or persons carrying on the business of banking, by a party having money in their hands, desiring them to pay, on presentment, to a person therein named or bearer, or to such person or order, a named sum of money." *Bouvier's Law Dictionary* 475 (3rd ed. 1848). Furthermore, it is clear that a check is considered to be included within the general term "chose in action." *See U.S. Industries, Inc. v. Anderson,* 579 F.2d 1227 (10th Cir. 1978); *Shingleton v. Armour Boulevard Corporation,* 96 F.2d 473 (8th Cir. 1938); *Dugan v. Missouri Neon & Plastic Advertising Co.,* 334 F. Supp. 1222 (W.D. Mo. 1971), *rev'd on other grounds,* 472 F.2d 944 (8th Cir. 1973); *Swann v. Morris,* 212 Ga. 460, 93 S.E.2d 673 (1956).

Having defined "check," we proceed to determine whether it is encompassed within the definition of property under the statute. It seems clear that when the provision using the term property to describe that which one may attach was included in the Code, a check was considered property. For instance, an 1852 case, *Newcomer v. Orem,* 2 Md. 297 (1852), indicates that "property" included choses in action well before the legislature amended the attachment law to provide that property is attachable. In *Newcomer,* the Court was faced with determining what law should be applied in distributing property from a decedent's estate. The law of the marital domicile applied to personalty and the law *rei sitae* to immovable property. However, the law of the place where the property was found had to be applied in determining whether it was movable or immovable property. *Id.* at 305. At issue in that case were certain notes which represented

proceeds of the sale of real estate. The question was whether the law of Maryland or Louisiana applied. The Court struggled with the nature of the notes as movable or immovable; however, there was no question that the notes (choses in action) were considered by the Court to be property. *See id.* at 308.

*Bouvier's Law Dictionary* also indicates that the term property included choses in action when added to the Code:

> Personal property is further divided into property in possession, and property or choses in action. See Chose in Action.
>
> Property is again divided into corporeal and incorporeal. The former comprehends such property as is perceptible to the senses, as lands, houses, goods, merchandise, and the like; the latter consists in legal rights, as choses in action, easements, and the like. [*Bouvier's Law Dictionary* 2751-52 (3rd ed. 1848).]

Choses in action seem to have been understood as property when this provision was drafted; [4] therefore, a check should be considered property under the attachment law.

However, to be attachable the Code directs that the check must be the *debtor's* property. As we see it, actual delivery to McSherry or such delivery as would indicate constructive possession and control by him was vital to the check's attachability because the check was worthless before reaching the hands of a person who could present it for

---

4. We note that a contemporary understanding of property also includes choses in action. In other contexts, Maryland law has indicated that choses in action are considered property. For instance, the Maryland Rules state that " '[p]roperty' means real, personal and mixed property, tangible and intangible, of *every kind and description.*" Md. Rule 5 z (emphasis supplied). Cases covering other aspects of Maryland law suggest that "property" encompasses choses in action. *See, e.g.,* Deering v. Deering, 292 Md. 115, 127, 437 A.2d 883 (1981) (quoting the California court's allusion in In Re Marriage of Brown, 15 Cal.3d 838, 845, 126 Cal. Rptr. 633, 637, 554 P.2d 561 (1976) (en banc) to a chose in action being a "form of property"); Neuman v. Travelers Indemnity Co., 271 Md. 636, 639-40, 319 A.2d 522 (1974) (quoting the trial judge's reference to choses in action as "other incorporeal property rights").

payment (*i.e.,* McSherry or his authorized agent). *See Morgenthau v. Fidelity & Deposit Co. of Maryland,* 94 F.2d 632, 635 (D.C. App. 1937) (noting that "where private persons are concerned a check is not to be regarded as property until it is delivered").

Here, the retirement check was mailed to Hoffman Chevrolet, which as agent for NADA Retirement Trust, was to deliver the check to McSherry. Hoffman arranged a meeting with McSherry so as to procure McSherry's indorsement and then to present the check to Hagerstown Trust to reduce the balance of the loan. However, McSherry did not keep this appointment and Hoffman left the check with Hagerstown Trust. Thereafter, a Hagerstown representative procured McSherry's indorsement and applied the proceeds against the trust loan. Thus, the check was not delivered to McSherry (and did not become his property) until after it had left Hoffman's possession.

We conclude, therefore, that the check, while in Hoffman's possession, had not been actually or constructively delivered to McSherry and was not attachable as his property. Consequently the trial court erred in ordering summary judgment for the amount of money represented by the check — $8,736.63.

Although Maryland law is sparse in this area, we have found one analogous case; however, it is readily distinguishable from the case at bar. In *de Bearn v. Prince de Bearn,* 115 Md. 668, 81 A. 223, *writ dism.,* 225 U.S. 695, 32 S.Ct. 834, 56 L.Ed. 1261 (1911), the appellants claiming to be creditors of Prince de Bearn, "sued out an attachment against him in the Superior Court of Baltimore City, as a non-resident of this State, by which they [sought] to subject the bonds [which were placed in a safe deposit box in the Safe Deposit & Trust Company, Baltimore and were subject to the joint control of the American Bonding Company and Alexander Brown & Sons] to condemnation and sale. The writ was laid in the hands of Alexander Brown & Sons and the American Bonding Company as garnishees." *Id.* at 671. The Prince filed a motion asking the court to release the

bonds from the operation of the attachments, because the bonds, which were merely evidences of indebtedness payable outside the State, were not attachable property. The lower court released the bonds, reasoning that the only thing upon which the writ can operate, " 'the sole property liable, is property upon the sale of which title would vest in the purchaser, or the title to which the Court could under the proceedings vest in the purchaser.' " *Id.* at 672. The garnishees were powerless to sell or transfer title to the property involved (*registered* coupon bonds). Therefore, the trial court concluded: " 'If the custodian could not transfer, and there is no person before the court with power to transfer the title I do not see how the Court could render a judgment of condemnation under which the bonds could be sold on execution.' " *Id.*

The Court of Appeals reversed, focusing on the fact that in prior litigation these bonds had been found to be the Prince's property. Therefore, the requirements of the attachment statute were satisfied. Reasoning that this property could be condemned and a Court of Equity could enforce a judgment, the Court concluded that the bonds should not have been released. However, the Court expressly limited its holding to the facts presented, stating: "It is not necessary to determine in these appeals the general question as to whether or not registered coupon bonds of foreign corporations are in all cases liable to attachment when located in this State." *Id.* at 677.

This case differs from *de Bearn* in two essential respects. Most significantly, the bonds in that case previously had been conclusively determined to be the Prince's property, while the check at issue in this case was not the debtor's property while in the garnishee's possession. Because the statute only authorizes attachment of the debtor's property in the garnishee's possession, this distinction is of vital significance. The Court in *de Bearn* simply did not focus on this element of the statute because it already had considered the case in which the ownership of the property had been settled. *See Prince de Bearn v. Winans,* 111 Md. 434, 74 A. 626 (1909).

The instant action also differs in that it involves a check, while *de Bearn* involved attaching coupon bonds. These bonds were registered as to principal only. The bond itself could only be transferred by the owner's "indorsement and transfer on the books of the issuing organization." Munn, *Encyclopedia of Banking and Finance* 637 (Garcia 6th ed. 1962). However, interest could be received simply by detaching the coupons and presenting them for payment. *Id.* In contrast, a check may only be paid after it has been negotiated.

A coupon bond represents the issuer's obligation to pay an amount of principal on a stated future date plus periodic interest charges. Based upon these factors and the probability of payment, such bonds have a market price and are routinely purchased and sold. However, a check represents money payable on demand at a bank. *See* Md. Code (1975), § 3-104 of the Commercial Law Article. There is no market for purchasing a check. If properly indorsed, it is simply presented for payment. The Court in *de Bearn* expressly noted that the coupon bonds could be condemned and sold. *See de Bearn v. Prince de Bearn, supra* at 677..The bonds had a market and a value in that market. However, the check in this case is worthless without being negotiated by the payee. Furthermore, it might not be paid if over six months old, *see* Md. Code (1975), § 4-404 of the Commercial Law Article, if a stop payment order is issued, *see id.* § 4-403, or if the account on which the check is drawn has insufficient funds. *See Fairfield v. Sacco Stone & Asphalt Co.,* 91 R.I. 446, 164 A.2d 853, 855 (1960) (noting that a check is not garnishable because it may never be paid).[5] Therefore, *de Bearn* also differs from the present case in this regard.

---

5. Other jurisdictions agree that a check is not attachable property. At common law a mere chose in action (*e.g.,* a promissory note or check) was not garnishable. *See* Annot., 41 A.L.R. 1003 (1926) (citing Re Dukes, 276 F. 724 (D.C. 1921); Craft v. Summersell, 93 Ala. 430, 9 So. 593 (1890); Field v. Lawson, 5 Ark. 376 (1844); McGehee v. Cherry, 6 Ga. 550 (1849); Crawford v. Schmitz, 139 Ill. 564, 29 N.E. 40 (1891); Smith v. Kennebec & P.R. Co., 45 Me. 547 (1858); Silloway v. Columbia Ins. Co., 8 Gray 199 (Mass. 1857); N.H.I.F. Co. v. Platt, 5 N.H. 193 (1830); Rhoads v. Megonigal,

## II

However, even if we did not reach the result in Part I for the reasons there stated, we nevertheless could not accept the rationale of the Court of Special Appeals for holding that the check was attachable. That court concluded that "when the NADART trustees issued the refund check to McSherry and forwarded it to Hoffman, the trust terminated insofar as McSherry was concerned"; the trust having terminated, the check was subject to attachment. *Hoffman Chev. v. Wash. Co. Nat'l Sav., supra,* at 597-98. As we see it, there are alternative grounds for concluding that the check was unattachable: under Maryland law the trust had not terminated and, in any event, the trust was not attachable under federal law.

In this case the relevant provision of the NADA Retirement Trust plan states:

Sec. 11.2 — NONALIENATION OF BENEFITS. Benefits payable under this Plan shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, garnishment, execution, or levy of any kind either voluntary or involuntary, including any such liability which is for alimony or other payments for the support of a spouse or former spouse, or for any relative of the participant, prior to actually being received by the person entitled to the benefit under the terms of the Plan, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, charge, or otherwise dispose of any right to benefits payable hereunder shall be void. The Trust shall not in any manner be liable for, or subject to, the debts, contracts, liabilities, engagements, or torts of any person entitled to benefits hereunder.

---

2 Pa. St. 39 (1845)). Construing statutes under which "property" or "goods or effects" are attachable, jurisdictions have concluded that checks or notes are not attachable. *See, e.g.,* Grosvenor v. Farmers & Mechanics Bank, 13 Conn. 104 (1839); Jordan v. Lavin, 319 Mass. 362, 66 N.E.2d 41 (1946);

This language clearly creates a spendthrift trust. Maryland generally recognizes the validity of such provisions in preventing creditors from reaching funds held in trust for a debtor. *See Safe Deposit & Tr. Co. v. Robertson,* 192 Md. 653, 65 A.2d 292 (1949); *Safe D. & T. Co. v. Ind. Brewing Asso.,* 127 Md. 463, 96 A. 617 (1916); *Smith v. Towers,* 69 Md. 77, 14 A. 497 (1888). Yet this Court has not specifically decided whether retirement benefits held in such a trust are subject to attachment. However, a logical extension of the rule announced in these cases leads to the conclusion that a spendthrift trust can effectively protect retirement benefits. The policies that led this Court to accept spendthrift trusts in 1888 also apply in this situation. The employer makes contributions to the trust to provide for the employee upon retirement. The creditor's interests are not great enough to permit an invasion of this trust. If the beneficiary can pay his debts upon becoming entitled to benefits of the trust, then he will. If he cannot, then the purpose of the trust should prevail. *See id.* at 89-91.

However, this general recognition of the validity of spendthrift trusts does not answer the precise question presented by these facts. The garnishor did not attempt to attach the trust, but rather the check itself. Therefore, the issue is whether the spendthrift trust protects a refund check that has not been delivered to the debtor.

Under the express terms of the trust, benefits are not attachable "prior to actually being received by the person entitled to the benefit under the terms of the Plan...." McSherry, the person "entitled" to the benefits, did not receive the check until it had left the garnishee's possession. Therefore, the provisions of the trust prohibit the asserted attachment in this case. However, this State does not necessarily afford the debtor the entire protection of the trust. *See, e.g., Safe Deposit & Tr. Co. v. Robertson, supra* (enforcing a rule based upon public policy even though the terms of the trust instrument would not authorize the payments required by the Court). Therefore, we must decide whether as a

Hancock v. Colyer & wife, & trustees, 99 Mass. 187 (1868); Hubbard v. Williams, 1 Minn. 54 (1858); Price v. Brady, 21 Tex. 614 (1858).

matter of State law the trust should be allowed to protect the check.

Initially we note that cases from other jurisdictions have adopted the rule suggested by the trust provision — that the check cannot be subject to the claims of creditors (because the trust remains in effect) until the check actually reaches the beneficiary's hands. For instance, in *Hildreth Press Emp. Fed. Cr. U. v. Connecticut G. L. Ins. Co.,* 30 Conn. Sup. 513, 295 A.2d 54, *certif. denied,* 295 A.2d 669 (1972), the court held a garnishment of the trustees of an employee pension fund null and void; therefore, the trustees properly turned funds over to the beneficiary rather than the creditor.

The scenario leading to this attempted garnishment was somewhat similar to the situation presented in this case. The debtor terminated his employment. His pension trust with his employer provided that upon completing five years service he could, upon termination of his employment, elect a payment of the funds accumulated. The debtor defaulted on a note owed the garnishor, who on May 11, issued a writ against the debtor, garnishing the employer two days later. On May 6, the debtor had applied to the trustees for payment of the funds due him, and they ordered the employer/garnishee to pay the funds to the employee. The garnishee received this notice on May 11, yet did not remit payment for fourteen days (after it had received the garnishment). The court, finding a valid spendthrift trust, rejected the garnishor's argument that "when the trustees approved Robert Austin's request for payment on May 6, 1970, they had divested themselves of all power over the funds in question." *Id.* at 56. The court stated that "[t]his state has rejected the 'dry trust' theory," *id.* at 57, and reasoned that the funds were protected until actually paid to the beneficiary. *See also Pueblo Regional Planning Comm. v. Spytek,* 36 Colo. App. 406, 542 P.2d 88 (1975).

The most significant difference between *Hildreth* and the instant action is that this Court previously has noted that Maryland recognizes the passive or dry trust theory. In *Owens v. Crow,* 62 Md. 491 (1884), our predecessors

recognized that a trust whose purpose has ceased and whose trustees have no duties or functions to perform cannot hold title to property as against the beneficiary — the real owner. This set of circumstances creates the dry or passive trust, which is now well established in Maryland law. *See Burnham v. Gas & Electric Co.,* 217 Md. 507, 144 A.2d 80 (1958). However, in the case *sub judice* the trust had not become dry or passive when the check was mailed to Hoffman Chevrolet. The duties of the trustees had not terminated and they in fact might have had further functions to perform. The trustees had a duty to ensure that the benefits reached the person entitled to receive them. Mailing the check to the beneficiary's former employer did not necessarily ensure that the benefits ultimately would reach him; this duty was not discharged until McSherry actually received the check. Furthermore, until the check was made negotiable, there was a possibility that the trustees would have had a further function to perform. If the check was lost or for some other reason never cashed, the trustees would have had to issue McSherry another check or transfer the benefits to which he was entitled in some other fashion. Under these circumstances, the trust did not become dry or passive until the benefits were actually received by the beneficiary. We conclude, then, that Maryland law provides the entire protection afforded by the spendthrift trust provision.

In fact, we note that a contrary conclusion would lead to an entirely illogical result. If the trustees' duties were terminated upon drawing the check, then the trust itself, could in effect be attached. A writ served on the trustees, although initially ineffective to reach the trust funds, would become effective as to each check drawn and prepared for mailing to the beneficiary. Such practice and procedure would totally subvert the spendthrift protection this Court has recognized to be valid.

Hoffman Chevrolet cites another case which is instructive. In *Christ Hospital v. Greenwald,* 82 Ill. App.3d 1024, 403 N.E.2d 700 (1980), the creditor attached the debtor's retirement fund, which paid him a pension of $275.00 per month.

Illinois recognizes the validity of spendthrift trusts, thus the court held that state law "prohibits garnishment of the pension funds." *Id.* at 702. However, the court proceeded to note that the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* (1976), also precludes garnishment of pension benefits. We think in this case, irrespective of state law, the Court of Special Appeals should have considered whether this federal statute preempted the field and extended full protection to the spendthrift trust.

Two provisions of ERISA are relevant. Section 1056(d) (1) states that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." Section 1144(a) provides:

> Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.

On the face of these provisions, a garnishment under State law is not specifically prohibited. However, the more well-reasoned authority indicates that Title 29, § 1056(d) (1) precludes garnishment as well as voluntary assignments or alienations. A New York court reached the opposite conclusion in *Nat. Bank of N. A. v. Intern. Broth., etc.,* 69 A.D.2d 679, 419 N.Y.S.2d 127, *appeal dism.,* 48 N.Y.2d 752, 422 N.Y.S.2d 666 (1979). That court reasoned that ERISA's "express prohibition of assignments and alienations (U.S. Code, tit. 29, § 1056, Subd. [d]) was not intended to bar the enforcement of money judgments by application of legal process, such as garnishment." *Id.* at 131. The court maintained that in other areas, where Congress intended to exempt benefits from execution or levy, it did so clearly, citing as examples, protection of Social Security benefits, 42 U.S.C. § 407 (1976); protection of Railroad Retirement Act benefits,

45 U.S.C. § 231m (1976); protection of Veterans' benefits, 38 U.S.C. § 3101 (1976). Therefore, the court concluded that Congress did not intend to preclude garnishment under ERISA plans when it did not so state.

This argument does not stand up to a careful examination of ERISA's purpose, legislative history and interpretive tax regulations. Section 401(a)(13) of the Internal Revenue Code, creating a federal exemption of covered pension benefits from creditor's claims, was added to the Code by ERISA.[6] The regulations interpreting this section state that benefits from qualified pension plans may not be "anticipated, assigned (either at law or in equity), alienated or subject to attachment, garnishment, levy, execution or other legal or equitable process." Treas. Reg. § 1.401(a)-13(d)(1). These Internal Revenue Regulations are of binding force and " 'should not be overruled except for weighty reasons.' " *Christ Hospital, supra* at 702 (citing *Bingler v. Johnson,* 394 U.S. 741, 89 S.Ct. 1439, 1445, 22 L.Ed.2d 695 (1969)). Furthermore, legislative history also indicates that Congress intended ERISA to preclude garnishment. After an exhaustive review of this somewhat cryptic history, the court in *Commercial Mortg. Ins. Inc. v. Citizens Nat. Bank,* 526 F. Supp. 510, 516-18 (N.D. Tex. 1981), concluded: "This Court has concluded that the only reasonable reading of both the language and the totality of the legislative history is that the assignment-alienation prohibition extends to involuntary assignments such as garnishments." *Id.* at 518. Furthermore, the policy underlying ERISA — protecting the interests of participants and their beneficiaries in employee benefit plans — suggests that garnishments are indeed covered by the § 1056(d)(1) alienation prohibition. *See* 29 U.S.C. § 1001(b) (1976). We agree with those courts that hold that § 1056(d) covers garnishment and other execu-

---

6. 26 U.S.C. § 401(a)(13) of the Internal Revenue Code of 1954 was added to the Code by ERISA, Pub. L. 93-406, § 1021(c). Section 401(a)(13) provides that a pension trust will not be "qualified" unless the plan contains essentially the same prohibition against assignment as is required by § 1056(d) of ERISA.

tions in addition to voluntary assignments and operates to prohibit garnishment of qualified pension plan benefits. As noted by the courts in *Christ Hospital, supra, Commercial Mortg., supra,* and *General Motors Corp. v. Buha,* 623 F.2d 455 (6th Cir. 1980), § 1144(a) is a provision preempting state laws. "It is central to the statutory scheme that ERISA not be subject to state and local laws which might frustrate its goals." *Id.* at 459. In fact, the Chairman of the Subcommittee on Labor of the House Committee on Education and Labor stated:

> Finally I wish to make note of what is to many the crowning achievement of this legislation, the reservation to Federal authority the sole power to regulate the field of employee benefit plans. With the preemption of the field, we round out the protection afforded participants by eliminating the threat of conflicting and inconsistent State and local regulation. [120 Cong. Rec. 29197 (1974).]

It is clear to us, therefore, that the legislative history and provisions of ERISA mandate that it shall supersede conflicting state law. Thus, even if Maryland law did permit attaching the pension plan benefits, the provisions of ERISA would preclude such an attachment.

## III

Hoffman Chevrolet next contends that summary judgment was erroneously granted for the unremitted commissions and pension plan deductions held by Hoffman Chevrolet for the account of McSherry. It argues that since McSherry was indebted to it, it was entitled to apply all the debtor's assets in its possession to reduce this indebtedness. Hoffman Chevrolet's statement of the law is basically correct. *See Messall v. Suburban Trust,* 244 Md. 502, 224 A.2d 419 (1966); *Md. Coop. Milk Producers v. Bell,* 206 Md. 168, 110 A.2d 661 (1955); *Farm. and Merch. Bk. v. Franklin Bk.,* 31 Md. 404 (1869). These cases authorize the garnishee

to appropriate funds in its hands belonging to the debtor against a debt which is due and payable at the time of trial. As this Court said in *Farmers, id.,* the garnishee must have the same rights against the creditor as he would have if being sued by the debtor. Thus if, "the note was not due at the time of garnishment, and was not, therefore, actionable, it was nevertheless an existing debt, payable at a future time, and becoming due before trial, was good matter 'of set-off, as well against the attaching creditor as against his debtor." *Id.* at 412.

However, Hoffman Chevrolet's problem is whether it produced sufficient evidence to demonstrate that at the time the trial court acted on the motion for summary judgment there was an existing mature debt of McSherry against which it could apply the funds in its possession. In other words, Hoffman Chevrolet was required to produce facts under oath, based on the personal knowledge of the affiant to defeat the motion. Bald, unsupported statements or conclusions of law are insufficient. *See* 1 *Poe's Pleading and Practice* § 411 at 33 (6th ed. 1975) (citing *Tri-State Properties, Inc. v. Middleman,* 238 Md. 41, 207 A.2d 499 (1965); *Dudley v. Montgomery Ward & Co.,* 255 Md. 247, 257 A.2d 437 (1969)). Furthermore, as Rule 610 states,[7] copies of all material papers referred to in an affidavit should be attached thereto.

---

7. Md. Rule 610 governs proceedings for summary judgment and provides:

    a. *Motion for.*

      1. When and by Whom Made.

In an action, a party asserting a claim, whether an original claim, counterclaim, crossclaim, or third-party claim, or a party against whom a claim is asserted, may at any time make a motion for a summary judgment in his favor as to all or any part of the claim on the ground that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law.

* * *

    3. Use of Affidavits.

The motion must be supported by affidavit when filed with the pleading asserting the claim or before the adverse party has filed his initial pleading to it; otherwise the motion may be made with or without supporting affidavits. Unless the court shall otherwise order for good cause shown, where the motion is required to be

The evidence presented to the trial court was not sufficient to meet these standards for defeating a motion for summary judgment. Hoffman Chevrolet relies on the deposition of John Martin; however, the following is the relevant portion of his testimony.

BY ATTORNEY EDWIN H. MILLER:

Q. Now, Mr. Martin, I show you a security agreement with Mr. and Mrs. McSherry and Hoffman Chevrolet, Inc. in the original amount of ... deferred purchase price of Twenty-two Thousand Three Hundred and Forty-seven Dollars and Sixty Cents ($22,347.60), is that correct?

A. Yes.

Q. That agreement was signed June 29th, 1979, is that correct?

A. Right.

Q. The collateral for that was a Winnebago Motor Home, 1979 Serial Number CCL331B-550163, is that correct?

---

supported by affidavit and the opposing party desires to controvert any statement of fact therein, he must file an affidavit or deposition in support of his answer to the motion. Such affidavit or deposition shall be filed before or at the time of filing his initial pleading unless the time for filing is extended pursuant to section a of Rule 309. The failure to file such opposing affidavit or deposition shall constitute an admission for purposes of the motion of all statements of fact in the affidavit of the moving party, but shall not constitute an admission that such motion or affidavit is legally sufficient. In all other cases the adverse party may file an opposing affidavit at or before the time of the hearing.

\* \* \*

B. *Form of Affidavit — Further Evidence.*

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn, or certified or photostatic copies of all material papers or parts thereof referred to in an affidavit shall be attached thereto or filed therewith or their absence satisfactorily explained. The court may permit affidavits to be supplemented or opposed by depositions or by further affidavits.

A. Yes, that's the collateral listed on the agreement.

Q. Within your knowledge, was that collateral in existence at the time of the execution of the contract?

A. Apparently not.

Q. And, insofar as you know, was there ever such a vehicle?

A. Apparently not.

Q. I have no other questions.

This testimony does not properly establish that the collateral never existed. Martin's response of "apparently not" does not pass the test that facts must be based on personal knowledge. Furthermore, even if this statement raised the issue of the non-existence of the collateral, the loan agreement with the Hagerstown Trust Company was not included in the record before the trial court. Therefore, Hoffman Chevrolet did not even establish that McSherry's loan was in default. No facts were presented to indicate that Hoffman Chevrolet was ever held liable on the loan or that the loan was in default. Therefore, the facts did not establish the existence of any certain indebtedness. McSherry's failure to respond to the interrogatory avails Hoffman Chevrolet nothing, because he made no assertion of fact under oath. Moreover, Hoffman and McSherry both were defendants in the proceeding below; therefore, we cannot presume that this failure to answer constituted any implied admission by Washington Bank.

Hoffman's answer to the attachment writ was not under oath and, therefore, not in a proper form for consideration on the motion. Hoffman's answer to the Motion for Summary Judgment was under oath; however, it presents no facts upon which to assert a setoff claim:

2. In answering Paragraph 3 of the Motion the Garnishee states that at the time of the laying of the attachment it was uncertain as to what amounts were due for sales commissions, but at

that time the Defendant, Victor H. McSherry, Jr., was indebted unto the Garnishee in an amount far exceeding the amount of commissions.

This is merely a formal denial of liability, insufficient to raise a dispute as to material fact. *See Foley v. County Commissioners,* 247 Md. 162, 230 A.2d 298 (1967).

Finally, even if Washington Bank's counsel admitted that a note was co-signed by Hoffman Chevrolet, this does not establish that the principal debtor, McSherry, was in fact indebted to the guarantor. Therefore, we conclude that the Court of Special Appeals properly upheld the lower court's entry of summary judgment for Washington Bank as to the amounts represented by the unremitted commissions and pension plan deductions. However, as noted above, the NADA Retirement Trust check was not attachable. Thus, the trial court erred in granting summary judgment as to the $8,736.63 represented by that check.

> *Judgment of the Court of Special Appeals reversed in part and affirmed in part.*
> *Case remanded to that Court to remand to the Circuit Court for Washington County for entry of a judgment consistent with this opinion.*
> *Costs to be divided equally.*