## SSA BALTIMORE FEDERAL CREDIT UNION

v.

### Daniel Frank BIZON, Sr.

Civ. No. K–83–1850.
Bankruptcy No. 82–2–0187.

United States District Court,
D. Maryland.

June 30, 1984.

H. Richard Piet, Baltimore, Md., for plaintiff.

Robert B. Greenwalt, Catonsville, Md., for defendant.

Richard M. Kremen, Baltimore, Md., for trustee.

FRANK A. KAUFMAN, Chief Judge.

SSA, Baltimore Federal Credit Union ("SSA"), appeals from a decision of the Bankruptcy Court (Mannes, J.) holding that civil service retirement monies due to Bizon, a chapter 7 debtor, are not part of Bizon's estate in bankruptcy, *In re Bizon*, 28 B.R. 886 (Bankr.D.Md.1983). The relevant and material facts are not in dispute.

On February 3, 1982, Bizon filed a chapter 7 petition. Prior thereto, Bizon had voluntarily, in February 1981, resigned his job with the Social Security Administration after approximately 17 years of service. At the time Bizon so left that government employment, he had accrued approximately $18,000 in the Civil Service Retirement and Disability Fund.[1] Under the Civil Service Retirement Act, 5 U.S.C. §§ 8331 *et seq.*, Bizon, because of his age and length of service, is not eligible in any event to receive annuity payments until the year 2005.[2] However, upon his separation from government service, Bizon became and re-

---

1. That fund was created pursuant to the Civil Service Retirement Act, *see* 5 U.S.C. § 8348, and is the depository of monies held under that Act.

2. Bizon, who was born in September 1943, does not meet the requirements for immediate retire-ment and is not eligible to receive a retirement annuity until 2005. *See* 5 U.S.C. §§ 8336, 8338(a).

mains presently eligible to receive, upon demand, the accrued total of his retirement fund contributions in the form of one lump-sum payment.[3] Judge Mannes assumed for the purposes of his decision that Bizon would, immediately after he achieved his discharge under chapter 7, elect to receive those funds in a lump sum. 28 B.R. at 887. That assumption is seemingly accepted by both parties to this appeal, and is taken as a "given" by this Court.

The debtor reported the funds as an asset of his estate under 11 U.S.C. § 541, but claimed an exemption as to them under section 522(b)(2)(A).[4] *Id.* 887. Judge Mannes did not reach the latter issue because he concluded that Bizon's retirement monies were not property of the estate in bankruptcy, in view of 11 U.S.C. § 541(c)(2) and 5 U.S.C. § 8346(a).[5]

On appeal, SSA contends that Bizon's interest in his retirement fund is neither excludable from the estate in bankruptcy under subsection 541(c)(2), nor exempt from his creditors under any provision of section 522.

### I

Section 541 was intended to include in the estate in bankruptcy the entire range of tangible and intangible assets of the debtor. It was designed, in contrast to statutory provisions in force and effect prior to the 1978 legislation, to "create a more uniform and comprehensive scope to 'property of the estate' which is subject to the reach of debtors' creditors ...." *Matter of Goff,* 706 F.2d 574, 578 (5th Cir.1983); *see also United States v. Whiting Pools,* 462 U.S. 198, —— – ——, 103 S.Ct. 2309, 2312–14, 76 L.Ed.2d 515, 521–22 (1983). Subsection 541(c)(2), however, as Judge Mannes stated, creates a narrow exception to the broad inclusionary scope of the re-

---

**3.** *See* 5 U.S.C. § 8342(a).

**4.** 11 U.S.C. § 541 provides in pertinent part:
§ 541. **Property of the estate**
(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located:
 (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

. . . . .

(b) Property of the estate does not include any power that the debtor may only exercise solely for the benefit of an entity other than the debtor.
(c)(1) Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision—
 (A) that restricts or conditions transfer of such interest by the debtor; or
 (B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or the taking possession by a trustee in a case under this title or a custodian, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.
 (2) A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title. 11 U.S.C. § 522(b) provides:

(b) Notwithstanding section 541 of this title an individual debtor may exempt from property of the estate either
 (1) property that is specified under subsection (d) of this section, unless the State law that is applicable to the debtor under paragraph (2)(A) of this subsection specifically does not so authorize; or, in the alternative,
 (2)(A) any property that is exempt under Federal law, other than subsection (d) of this section, or State or local law that is applicable on the date of the filing of the petition at the place in which the debtor's domicile has been located for the 180 days immediately preceding the date of the filing of the petition, or for a longer portion of such 180-day period than in any other place; and
 (B) any interest in property which the debtor had, immediately before the commencement of the case, an interest as a tenant by the entirety or joint tenant to the extent that such interest as a tenant by the entirety or joint tenant is exempt from process under applicable nonbankruptcy law.

**5.** The latter section provides:
 (a) The money mentioned by this subchapter is not assignable, either in law or equity, except under the provisions of subsections (h) and (j) of section 8345 of this title, or subject to execution, levy, attachment, garnishment, or other legal process, except as otherwise may be provided by Federal laws.

mainder of section 541. That exception "preserves restrictions on transfer of a spendthrift trust to the extent that the restriction is enforceable under applicable nonbankruptcy law." H.R.Rep. No. 595, 95th Cong., 2d Sess. 369, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6325; *see also Goff,* 706 F.2d at 580.

In *Goff,* two self-employed debtors claimed that their ERISA-qualified Keogh retirement plans were excluded from their chapter 7 estates by virtue of the statutory prohibitions on alienation which govern such plans.[6] The debtors contended that those statutory provisions, in and of themselves, constituted the "applicable nonbankruptcy law" to which subsection 541(c)(2) makes reference. Judge Williams, for the Fifth Circuit, rejected that contention in favor of a conclusion that subsection 541(c)(2) referred only to "traditional state spendthrift trust law", 706 F.2d at 581, concluding that the legislative history of subsection 541(c)(2) indicated that "Congress intended by its reference to 'applicable nonbankruptcy law' to exempt only those 'spendthrift trusts' traditionally beyond the reach of creditors under state law." *Id.* at 582. In addition, in *Goff,* the Court considered that the debtors argument for an expansive definition of "applicable nonbankruptcy law" fell afoul of the explicit references in 11 U.S.C. § 522 (which concerns exemptions of property included in the estate) "to 'federal law' or pension laws, including ERISA when federal as opposed to state law is the subject of the reference," *id.,* and that, therefore, the use of other more specific terms to refer to federal law elsewhere in the Bankruptcy Code negated a possible inference that "applicable nonbankruptcy law" included the statutory provisions of ERISA. Accordingly, Judge Williams wrote:

> Section 541(c)(2) ... was never intended to include ERISA in its reference to "ap-

plicable nonbankruptcy laws." Congress made reference to federal law and pension benefits [in section 522] when such a characterization was intended; yet it did not do so in Section 541(c)(2).... Congress was well aware of ERISA, specifically considered the role of pension benefits in bankruptcy proceedings in Section 522 and did not grant a broad exemption. The only reasonable inference to draw is that Congress intended that pensions provided for by federal law be insulated from bankruptcy only to the extent recognized in Section 522.

*Id.* at 586. This did not mean, Judge Williams cautioned, that ERISA pensions were always included in the estate by section 541, but rather that "their exclusion under that section is provided solely by state spendthrift trust law and not by operation of ERISA." *Id.* (footnote omitted). Thus, if the statutory provisions of ERISA in combination with the other provisions of the pension plan qualified as a valid spendthrift trust under applicable state law, the funds held in the plan were not property of the estate.

In the last section of its opinion, the Court in *Goff* considered the question of whether the ERISA-qualified pension plan constituted a spendthrift trust under state law. The Court, looking to the law of Texas, found that the requisites of such a trust was lacking:

> Our reasoning in the *Witlin* case [640 F.2d 661, 663 (5th Cir.1981)] is persuasive. There we held that self-settled Keogh plans were not exempt under the spendthrift provision of the old Bankruptcy Act. We said: "There is ... a strong policy that will prevent any person from placing his property in what amounts to a revocable trust for his own benefit which would be exempt from the claims of his creditors." 640 F.2d at 662. *See Glass v. Carpenter,* 330 S.W.2d 530,

---

**6.** Keogh plans are established pursuant to the Keogh-Smathers Act, Pub.L. No. 87–792, 76 Stat. 809 (1962) (codified in a number of sections of the Internal Revenue Code). ERISA refers to the Employee Retirement Income Security Act of 1974, Pub.L. No. 93–406, 88 Stat. 898 (codi-

fied in 29 U.S.C. §§ 1001–1144, and in scattered sections of the Internal Revenue Code). The statutory prohibitions on assignment and alienation which govern such plans are found in 26 U.S.C. § 401(a)(13) and 29 U.S.C. § 1056(d)(1).

534 (Tex.Civ.App. San Antonio 1959, writ ref'd n.r.e.) [stating that Texas law follows the principle quoted from *Witlin*]. Here as in *Witlin,* appellant-debtors attempted such a revocable trust for their own benefit. They retained freedom to withdraw their Keogh plan assets, yet purported to insulate those assets from their creditors. If this dichotomous treatment were to be recognized, the strong common law policy of spendthrift trusts, as well as the Bankruptcy Code's intent, would be subverted. Debtors could shelter funds in Keogh plans immediately before declaring bankruptcy—as did the Goffs with at least some of their funds—and immediately after discharge of all debts withdraw such funds for their own benefits. Whatever might be the rule in a nonbankruptcy setting involving ERISA's provisions we hold that neither law nor equity would afford self-settled Keogh plans "spendthrift" exemptions in bankruptcy.

*Id.* at 588 (footnotes omitted).[7] However, in what appears to be *dicta,* Judge Williams noted that "employer-created-and-controlled" pension plans might well qualify as spendthrift trusts. *Id.* at 589.

In *In re Graham,* 726 F.2d 1268 (8th Cir.1984), a chapter 7 debtor also argued that his ERISA-qualified pension plan was not included in his estate pursuant to subsection 541(c)(2) because "applicable nonbankruptcy law" included ERISA. Judge McMillian rejected that argument in the face of the treatment of pension plans under section 522, because the implication of the reference in the latter section to pension plans was that such plans were included in the estate and withheld from creditors only to the extent specified in section 522. Judge McMillian wrote:

We thus see a coherent scheme regarding a debtor's pension rights under the Code consistent with the Code's general policy. The question of pension rights is dealt with as a matter of exemption. A debtor's interest in pension funds first comes into the estate. To the extent they are needed for a fresh start they may then be exempted out.

726 F.2d at 1272–73. The Court in *Graham,* although it cited to *Goff,* apparently did not consider it necessary to reach the issue of whether the debtor's pension met the applicable state law standards for a spendthrift trust and would thus be excluded.[8] In that connection, *see United States v. Devall,* 704 F.2d 1513, 1516 (11th Cir. 1981); *Reagan v. Ross,* 691 F.2d 81, 86 (2d Cir.1982). In *Goff,* the trustee argued as follows:

[T]he inclusion in Section 522(d) of pension benefit exemption, 11 U.S.C. § 522(d)(10)(E), for those making a federal [exemption] election, negatives any congressional intent to include any ERISA pensions at all within the ambit of Section 541[ (c)(2) ].

706 F.2d at 587. However, Judge Williams rejected that argument as an "arbitrary interpretation" of the Code:

Section 522(d)(10)(E) reaches a broad array of employment benefits and exempts both qualified and unqualified pension plans, to the extent such benefits are reasonably necessary for the support of the debtor and his dependents. Given this much broader exemption of benefits available only to those making a federal election we find no reason to doubt that ERISA-qualified pension funds are included in Section 541[ (c)(2) ] if they qualify as spendthrift trust plans under state law.

*Id.* (footnote omitted).[9] As further support for his conclusion, Judge Williams wrote in

---

7. *See also Matter of Johnson,* 724 F.2d 1138, 1140 (5th Cir.1984) (retirement plan not a valid spendthrift trust when participation was voluntary and terminable at will and when the corpus of the trust consisted of contributions from the beneficiary/settlor).

8. It is to be noted that the trust in *Graham,* like the trust in *Goff,* was, in essence, a self-settled

trust. *See Graham,* 726 F.2d at 1269; *In re Graham,* 24 B.R. 305, 307–08, 310 (Bankr.N.D. Iowa 1982).

9. *See also In re Clark,* 711 F.2d 21, 23–24 (3d Cir.1983) (Becker, J., concurring).

It is to be noted that civil service retirement pensions are explicitly referred to in the legisla-

*Goff* that "it is not 'remarkable that Congress did not bother to further complicate an already complex code by taking pains to insure that there was no overlap' between sections." 706 F.2d at 587 *quoting from*

*In re Threewit,* 24 B.R. 927, 930 (D.Kan. 1982). The legislative history of the 1978 Bankruptcy Code bears out the observations in *Goff* and *Threewit* that Congress did not eliminate all overlap between sections.[10]

tive history of subsection 522(b)(2)(A). The Senate Report provides:

Section 522. Exemptions

Subsection (b) tracks current law. It permits a debtor the exemptions to which he is entitled under other Federal law and the law of the State of his domicile. Some of the items that may be exempted under Federal laws other than title II include:

Foreign Service Retirement and Disability payments, 22 U.S.C. 1104;

Social security payments, 42 U.S.C. 407;

Injury or death compensation payments from war risk hazards, 42 U.S.C. 1717;

Wages of fishermen, seamen, and apprentices, 46 U.S.C. 601;

Civil service retirement benefits, 5 U.S.C. 729, 2265;

Longshoreman's and Harbor Workers' Compensation Act death and disability benefits, 33 U.S.C. 916;

Railroad Retirement Act annuities and pensions, 45 U.S.C. 228(L);

Veterans benefits, 45 U.S.C. 352(E);

Special pensions paid to winners of the Congressional Medal of Honor, 38 U.S.C. 3101; and

Federal homestead lands on debts contracted before issuance of the patent, 43 U.S.C. 175.

[5 U.S.C. § 2265 is now 5 U.S.C. § 8346] S.Rep. No. 989, 95th Cong., 2d Sess. 75, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5861.

The House Report also makes explicit reference to civil service retirement benefits. *See* H.R.Rep. No. 595, 95th Cong., 2d Sess. 360, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6316.

**10.** The Code was itself the product of compromises between the original proposals of the Bankruptcy Commission and various House and Senate versions of the proposed Code. A House passed version of section 522 gave debtors a choice between the uniform set of federal exemptions proposed by the Commission on the Bankruptcy Laws of the United States and state exemptions. A Senate version retained the prior law's reliance on state exemptions (coupled with federal nonbankruptcy law). Under the Code as finally enacted by both Houses, states are permitted to opt out of the federal exemptions, pursuant to the authorization of section 522(b)(1). If a state so does, the Senate position prevails. In states which do not opt out, the House position governs. *See* W. Vukowich, Debtors' Exemption Rights under the Bankruptcy Reform Act, 58 N.C.L.Rev. 769, 773–74

(1980). The only evidence of what led to that compromise between the House and Senate positions concerning section 522 is found in a statement by Senator DeConcini in the Congressional Record:

Section 522 of the [final bill] represents a compromise on the issue of exemptions between the position taken in the House bill, and that taken in the Senate Amendment. Dollar amounts specified in section 522(d) of the House bill [the uniform federal exemptions] have been reduced from amounts as contained in H.R. 8200 as passed by the House. The States may, by passing a law, determine whether the Federal exemptions will apply as an alternative to State exemptions in bankruptcy cases.

124 Cong.Rec. S17412 (daily ed. Oct. 6, 1978) (Statement of Sen. DeConcini), *reprinted in* 3 App. Collier on Bankruptcy X–25 (15th ed. 1983).

With respect to the question of spendthrift trusts and their inclusion as property of the estate, the Commission report proposed that the exclusion of such trust under the prior law be limited to permitting the debtor "to retain sufficient income to support himself and his dependents." Any beneficial interest in excess of that figure would be property of the estate. Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc. No. 137, 93d Cong., 1st Sess. 197–98 (1973), *reprinted in* 2 App. Collier on Bankruptcy. The Commission position was adopted by the Senate; but the House preserved the restriction on inclusion of spendthrift trusts without limitation. *See* S.Rep. No. 989 at 83, *reprinted in* 1978 U.S.Code Cong. & Ad.News at 5869; H.R.Rep. No. 595 at 369, *reprinted in* 1978 U.S.Code Cong. & Ad.News at 6325. The enacted bill adopted the House version with this comment from Senator DeConcini:

Section 541(c)(2) follows the position taken in the House bill and rejects the position taken in the Senate amendment with respect to limitations on a spend-thrift trust.

124 Cong.Rec. S17413, *reprinted in* 3 App. Collier on Bankruptcy X–27.

For cases in which the bankruptcy courts have looked, at least to some extent, to state law in dealing with cases involving issues similar to those posed herein, *see Warren v. G.M. Scott,* 34 B.R. 543 (Bankr.S.D.Ohio 1983); *Matter of Berndt,* 34 B.R. 515, 516–18 (Bankr.N.D.Indiana 1983); *In re Werner,* 31 B.R. 418, 420–21 (Bankr.D.Minn.1983); *In re DiPiazza,* 8 Collier Bank.Cas.2d 654, 656–62 (Bankr.N.D.Ill.1983);

## II

In *Goff,* the Court made reference to Texas law, 706 F.2d at 587, as the "applicable nonbankruptcy law" under subsection 541(c)(2). In *Matter of Witlin,* 640 F.2d 661 (5th Cir.1981), Judge Tuttle, dealing with the pre-1978 bankruptcy statute, referred to Florida law. In *First Northwestern Trust Co. v. Internal Revenue Service,* 622 F.2d 387, 391 (8th Cir.1980), cited by Judge Mannes in his opinion below, Judge Ross, also dealing with the pre-1978 bankruptcy statute, looked to South Dakota law to determine whether or not the debtor's trust was immune from the trustee as a valid spendthrift trust.[11] Other cases, under prior law, indicate that the question of whether a particular fund qualifies as a spendthrift trust should be evaluated under the law of the situs of the fund.[12] In this case the funds are held in the Civil Service Retirement Fund, a fund controlled by an agency of the United States Government. In determining the situs of such funds for purposes of administering an estate, the situs of debts of the United States to the deceased is considered to be the state of the deceased's domicile. In *Vaughan v. Northrup,* 40 U.S. (15 Pet.) 1, 10 L.Ed. 639 (1841), the administrator of an intestate former resident of Kentucky had obtained a sum of money from the United States Treasury which was owed to the intestate "for military services rendered during the Revolutionary war." 40 U.S. (15 Pet.) at 5. Parties claiming to be the intestate's next of kin brought suit for an accounting against the administrator in the Circuit Court of the District of Columbia. The Supreme Court affirmed the lower court's dismissal for lack of jurisdiction, holding that the situs of the debt was the intestate creditor's domicile and that the suit should, therefore, have been brought in Kentucky. Justice Story, writing for the Court, stated:

> The debts due from the government of the United States have no locality at the seat of government. The United States, in their sovereign capacity, have no particular place of domicile, but possess, in contemplation of law, an ubiquity throughout the Union; and the debts due by them are not to be treated like the debts of a private debtor, which constitute local assets in his own domicile.

*Id.* at 6. *See also United States v. Borcherling,* 185 U.S. 223, 233, 22 S.Ct. 607, 611, 46 L.Ed. 884 (1902); *Wyman v. United States,* 109 U.S. 654, 656–59, 3 S.Ct. 417, 418–20, 27 L.Ed. 1068 (1884); *Diehl v. United States,* 438 F.2d 705, 710 (5th Cir. 1971). That principle has also been applied in the context of receivership. *See Phillips v. Noel Construction Co.,* 266 F. 603, 606–07 (D.C.Cir.), *cert. denied,* 254 U.S. 631, 41 S.Ct. 7, 65 L.Ed. 447 (1920).

By analogy to those cases and because of Bizon's Maryland residence, the law of the state of Maryland is the applicable state law to determine if Bizon's retirement fund qualifies as a spendthrift trust.[13] With regard to Maryland law, SSA argues (A) that the retirement fund is not a trust, but that (B) if it is a trust, the language of 5 U.S.C. § 8346(a) does not create a valid spendthrift trust, and (C) that in any event the trust terminated when Bizon resigned from federal service.

## A

Under Maryland Law, a trust is defined as follows:

---

but see *Matter of Kelley,* 31 B.R. 786, 788 (Bankr.N.D.Ohio 1983).

**11.** Because of the continuity with regard to the exclusion of spendthrift trusts under the present law and under prior law, *see* note 10 *supra,* the fact that *Witlin* and *First Northwestern Trust* were both decided under prior law would not appear to alter their applicability herein.

**12.** *See In re Ahlswede,* 516 F.2d 784, 786 (9th Cir.1975), *cert. denied sub nom., Stebbins v. Crocker-Citizens National Bank,* 423 U.S. 913, 96

S.Ct. 218, 46 L.Ed.2d 142 (1975); *Danning v. Lederer,* 232 F.2d 610, 612 (7th Cir.1956); *Thummess v. Von Hoffman,* 109 F.2d 293, 295 (3d Cir.1940); *Suskin & Berry v. Rumley,* 37 F.2d 304, 305 (4th Cir.1930); *Allen v. Tate,* 6 F.2d 139, 140 (8th Cir.1925).

**13.** Seemingly, both parties accept the application of Maryland law and have presented the within case on that assumption.

In its technical sense, the word "trust" has been defined as the right, enforceable solely in equity, to the beneficial enjoyment of property, the legal title to which is vested in another. It is fundamentally essential to the existence of any trust that there be a trust res or subject matter and that there be a separation of the legal estate from the beneficial enjoyment.

21 Maryland Law Encyclopedia, Trust § 1, at 345 (West 1962). In the instant case, the money in controversy is held in the Civil Service Retirement and Disability Fund. That fund consists of employee and government contributions. Until the statutory prerequisites are met, an employee has no right of access to those funds, either on a lump-sum basis or in the form of an annuity. The fact that part of the fund consists of employee contributions does not affect the question of legal title because such contributions are viewed as "never in fact paid or made subject to the disposition of the employees...." *See Anderson v. United States*, 205 F.2d 326, 328 (9th Cir. 1953). However, once the requirements of the statute are satisfied, Bizon or any other civil service employee has the statutory right to demand payment in the form and amount appropriate under the statute. *See Hogan v. United States*, 513 F.2d 170, 174 (6th Cir.), *cert. denied*, 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 55 (1975). The employee's beneficial interest during the period of his government service can accordingly be seen as "a contingent interest which is not to vest until the happening of a condition precedent [*i.e.* termination of service, retirement, death]." G. Bogert, Trusts & Trustees, § 112 at 571 (2d ed. 1965).

 Civil service retirement funds are funds held in trust. *See Avant v. United States*, 165 F.Supp. 802, 805 (E.D.Va.1958) (Hoffman, Jr.). Indeed, 31 U.S.C. § 1321(a)(88) provides specifically that the Civil Service Retirement and Disability Fund shall be held in trust. Accordingly, the Civil Service Retirement and Disability Fund qualifies as a trust under Maryland law.

## B

Since *Smith v. Towers*, 69 Md. 77, 14 A. 497 (1888), Maryland has recognized the validity of spendthrift trusts. Among the limitations imposed on such trusts in Maryland is the prohibition that "a person may not create such a trust for his own benefit." *Watterson v. Edgerly*, 40 Md.App. 230, 232, 388 A.2d 934 (Ct.Spec.App.1978). Another limitation is that the protection established by a spendthrift trust "should not be extended to claims for support or alimony." *Safe Deposit & Trust Co. v. Robertson*, 192 Md. 653, 663, 65 A.2d 292 (1949). On the issue of partial spendthrift trusts, i.e. those where alienation or assignment by the beneficiary is not restricted but attachment or garnishment by creditors is, Maryland law is less clear. The original formulation of *Smith v. Towers* considered both the right to prohibit alienation and the right to exclude creditors. *See* 69 Md. at 87–91, 14 A. 497. Other cases suggest that a partial spendthrift trust is enforceable. In *Plitt v. Yakel*, 129 Md. 464, 465–67, 99 A. 669 (1916), the Court held effective a spendthrift provision which prohibited "attachment for any debt or other obligation whatsoever" but did not mention any restriction on alienation. Concerning partial spendthrift provisions, Scott states: "[I]t would seem that the creator of the trust should not be permitted to make the interest of the beneficiary exempt from the claims of his creditors if the beneficiary is permitted to make a voluntary transfer of his interest." II A. Scott, The Law of Trusts, § 152.3 at 1153 (3d ed. 1967). On the other hand, Bogert states:

> If the settlor expressly states that his beneficiary is to be subject to a restraint as to voluntary alienation, but makes no mention of a restraint as to creditors; or if he excluded the rights of creditors but does not express any intent with regard to assignments by the beneficiary, it would seem that the single restraint should be valid.

G. Bogert, Trusts & Trustees, § 222 at 400–01 (rev. 2d ed. 1979) (footnote omitted).

■ The funds in question in this case came into being by statutory enactment pursuant to 5 U.S.C. § 8331 *et seq.* Bizon had no choice in connection with his or the government's contributions. Thus, the funds involved in this case do not constitute a self-settled trust.

The first of two statutory exceptions stated with regard to the spendthrift provision here at issue, 5 U.S.C. § 8346(a), *see* n. 5, *supra,* 5 U.S.C. § 8345(j) concerns payments made pursuant to the terms "of any court decree of divorce, annulment or legal separation." [14] Since Maryland courts imply such a provision even if it is not included in the trust, *see Robertson,* 192 Md. at 655, 65 A.2d 292, an explicit statutory provision with regard to the same does not prevent the statutory funds here in question from being a valid spendthrift trust. As to the other statutory exception, 5 U.S.C. § 8345(h), which allows for assignments "from [an] annuity for such purposes as the Office of Personnel Management in its sole discretion considers appropriate", [15] the regulations issued by that Office of Personnel Management indicate that that right of assignment is severely restricted. First, assignments can only be made by individuals receiving annuities. *See* 5 C.F.R. §§ 831.1501(a) & (d) (1983). [16] Second, assignments can only be made to a limited number of qualified organizations. *See* 5 C.F.R. §§ 831.1511(a) & 831.1521(h) (1983). Accordingly, under applicable federal law and regulations, Bizon has no present ability to assign any portion of his retirement monies and will not have the same until he starts to receive an annuity in the year 2005. The fact that he will in the future have that right, if he has not before that right becomes effective withdrawn his funds, does not, under Maryland law discussed *supra,* mean that the funds are not a valid spendthrift trust at this time, even if classified as a partial spendthrift trust.

### C

■ Under Maryland law, "a trust whose purpose has ceased and whose trustees have no duties or functions to perform cannot hold title to property as against the beneficiary—the real owner." *Hoffman Chevrolet v. Washington County National Savings Bank,* 297 Md. 691, 707–708, 467 A.2d 758 (1983). Such circumstances create a "dry or passive trust." *Id.* SSA contends that because Bizon, when he retired, needed only to demand his retirement funds in order to receive them, the trust in this case became "dry or passive" upon Bizon's retirement. If so, under Maryland law, legal title in the trust would have

---

**14.** Section 8345(j)(1) provides:

(j)(1) Payments under this subchapter which would otherwise be made to an employee, Member, or annuitant based upon his service shall be paid (in whole or in part) by the Office to another person if and to the extent expressly provided for in the terms of any court order or court-approved property settlement agreement incident to any court decree of divorce, annulment, or legal separation. Any payment under this paragraph to a person bars recovery by any other person.

**15.** Section 8345(h) provides:

(h) An individual entitled to an annuity from the Fund may make allotments or assignments of amounts from his annuity for such purposes as the Office of Personnel Management in its sole discretion considers appropriate.

A letter from the Chairman of the Civil Service Commission found in the legislative history to the amendment to section 8346(a) which provided for the assignments specified in section 8345(h) also specified other deductions for which a Civil Service annuitant could opt: tax withholding, life insurance, federal health benefit premiums and Medicare. *See* S.Rep. No. 537, 94th Cong., 1st Sess., *reprinted in* 1975 U.S.Code Cong. & Ad.News 2066.

**16.** 5 C.F.R. § 831.1501 (1983) provides:

**Subpart O—Allotments from Civil Service Annuities**

. . . . .

**§ 831.1501 Definitions.**

(a) "Allotment" means a specified deduction from the annuity payments due an annuitant voluntarily authorized by the annuitant to be paid to an allottee.

. . . . .

(d) "Annuity Payments" means the net monthly annuity payment due an annuitant after all authorized deductions (such as those for health benefits, Federal income tax, overpayment of annuity, payment of a government claim, etc.) have been made.

passed to him before he filed his chapter 7 petition, and accordingly, the fund would fall within his estate in bankruptcy.

In *Hoffman Chevrolet,* Washington County National Savings Bank ("Washington National") held two promissory notes authored by Victor McSherry, a former employee of Hoffman Chevrolet. McSherry also had a note outstanding to Hagerstown Trust Company which was co-signed by Hoffman Chevrolet. When McSherry defaulted on his notes held by Washington National, the latter obtained two judgments against him. In an attempt to satisfy those judgments, Washington National garnished all of McSherry's assets held by Hoffman Chevrolet. In response to that garnishment, Hoffman Chevrolet stated that it had applied all of McSherry's assets in its possession to the satisfaction of the note due to Hagerstown Trust. Among the assets conveyed to Hagerstown Trust Company was a check for $8,736.63 made out to McSherry from the National Automobile Dealers Association Retirement Trust (NADART). McSherry had applied for this check when he left his job at Hoffman Chevrolet. At that time, he told Hoffman Chevrolet's manager that he would sign over the check to Hagerstown Trust Company when it was received from NADART by Hoffman Chevrolet. When the check was received by Hoffman Chevrolet, McSherry did so.

Washington National contended that the check, when Hoffman Chevrolet received it, was an attachable asset of McSherry in the hands of Hoffman Chevrolet which was subject to the garnishment. The trial court granted Washington National's motion for summary judgment on that basis. The Court of Special Appeals of Maryland af-

firmed, *see* 50 Md.App. 594, 439 A.2d 50, on the basis that "when the NADART trustees issued the refund check to McSherry and forwarded it to Hoffman, the trust terminated insofar as McSherry was concerned." 297 Md. at 705, 467 A.2d 758, *quoting* 50 Md.App. at 597–98, 439 A.2d 50. The Court of Appeals held that ruling was error.

Judge Cole, writing for a unanimous Court, quoted the spendthrift provision in the NADART pension plan [17] and concluded that "retirement benefits held in such a trust are [not] subject to attachment." However, he recognized that that did not answer the precise question at issue. Despite the provision in the retirement fund agreement that benefits under the fund were not attachable "prior to actually being received by the person entitled to the benefit under the terms of the Plan," the question remained, whether Maryland law viewed the trust as passive. The Court of Appeals held that the trust had not "become dry or passive when the check was mailed to Hoffman Chevrolet", 297 Md. at 708, 467 A.2d 758, because "[t]he duties of the trustees had not terminated and they in fact might have had further functions to perform." *Id.* There were, Judge Cole wrote, many occurrences possible which could require further action by the trustees, in view of the scope of their duty to McSherry:

> The trustees had a duty to ensure that the benefits reached the person entitled to receive them. Mailing the check to the beneficiary's former employer did not necessarily ensure that the benefits would actually reach him; this duty was not discharged until McSherry actually received the check. If the check was lost

---

17. The spendthrift provision in the NADART plan stated:

> **Sec. 11.2—NONALIENATION OF BENEFITS.** Benefits payable under this Plan shall not be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, charge, garnishment, execution, or levy of any kind either voluntary or involuntary, including any such liability which is for alimony or other payments for the support of a spouse or former spouse, or

for any relative of the participant, prior to actually being received by the person entitled to the benefit under the terms of the Plan, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, charge, or otherwise dispose of any right to benefits payable hereunder shall be void. The Trust shall not in any manner be liable for, or subject to, the debts, contracts, liabilities, engagements, or torts of any person entitled to benefits hereunder.

or for some other reason never cashed, the trustees would have had to issue McSherry another check or transfer the benefits to which he was entitled in some fashion. Under these circumstances, the trust did not become dry or passive until the benefits were actually received by the beneficiary. We conclude, then, that Maryland law provides the entire protection afforded by the spendthrift provision.

*Id.*

While the instant case is distinguishable on the basis of different wording of the spendthrift provisions (*i.e.*, the spendthrift reference found in section 8346(a) does not contain language which extends its protection to the moment of actual receipt), *Hoffman Chevrolet* teaches that the concept of a dry or passive trust is dependent on the existence and the scope of the remaining duties of the trustee. In that regard, there is little to distinguish the instant case from *Hoffman Chevrolet*. If anything, because herein there has been no demand, preparation or mailing of any check, the present remaining duties of the trustee are greater than in *Hoffman Chevrolet*. Accordingly, the trust involved in the instant case has not terminated, under applicable, *i.e.*, Maryland, law and accordingly the spendthrift protections are still valid.

### III

The language of section 8346(a) which is set forth *supra*, at note 5, limits its effect to the extent "as otherwise may be provided by federal law." That language was added to section 8346(a) in 1975 by Public Law No. 94–166. *See* 5 U.S.C. § 8346 Amendments (1976). The purpose of Public Law No. 94–166 was to allow for assignments as provided in section 8345(h), discussed at 346, *supra*. The legislative history of Public Law No. 94–166 does not disclose the reason for the addition of that language. *See* S.Rep. No. 537, 94th Cong., 1st Sess., *reprinted in* 1975 U.S.Code Cong. & Ad.News 2064. However, the legislative history with respect to subsequent changes in section 8346(a) does shed some light on the Congressional intent in enacting the language "except as otherwise may be provided by federal law." In the amendment which permitted deductions from annuities pursuant to alimony or child support obligations, discussed at 346 *supra*, the Senate Government Affairs Committee stated its understanding of the exception clause to section 8346(a) as follows:

Under existing law (5 U.S.C. 8346(a)), payments under the civil service retirement system are not assignable or subject to execution, levy, attachment, garnishment, or other legal process, except as may be *expressly* provided by Federal laws.

*See* S.Rep. No. 1084, 95th Cong., 2d Sess. 2, *reprinted in* 1978 U.S.Code Cong. & Ad.News 1379, 1380 (emphasis added).

Against that background, SSA's contention that the lump sum payment provision of the Civil Service Retirement Act falls within the exception clause to section 8346(a) is without merit. There is no mention of the lump sum provision in the exceptions to section 8346(a) listed in the letter from the Civil Service Commission which accompanies the Senate Report on Public Law No. 94–166. *See* 346, note 15 *supra*. Nor, is there any express indication in 5 U.S.C. § 8342 that lump sum payments are not to be subject to section 8346(a)'s spendthrift protection.

SSA also contends that the 1978 Bankruptcy Code modified the spendthrift provisions of section 8346(a). There is no express provision in the Code repealing or modifying section 8346(a). The list of statutes affected by the Bankruptcy Code does not mention any provision of the Civil Service Retirement Act. *See* 92 Stat. 2549, 2673–82 (1978). Two recent cases are instructive in a somewhat different context as to implied repeal or modification. In *United States v. Devall*, 704 F.2d 1513 (11th Cir.1983), the provisions of the Bankruptcy Reform Act of 1978 were found to have modified by implication the spendthrift provisions protecting social security payments, 42 U.S.C. § 407. In *In re Buren*, 725 F.2d 1080 (6th Cir.1984), the oppo-

site conclusion was reached. Analysis of those two cases indicates that even under the view taken in *Devall* there is no repeal or modification of section 8346(a) which affects the result in the instant case.

The precise question addressed in *Buren* and *Devall* was the permissibility of income deduction orders under chapter 13 plans which reached the debtors' social security payments. Judge Hill in *Devall* concluded that the legislative history of the Bankruptcy Reform Act of 1978 demonstrated that Congress intended that social security payments be reachable by chapter 13 debtors. In so doing, Judge Hill cited a passage in the House Report stating: "[e]ven individuals whose primary income is from investments, pensions, *social security,* or welfare may use chapter 13 if their income is sufficiently stable and regular." 704 F.2d at 1516 (emphasis added by Judge Hill). Accordingly, there was a conflict between the Code and 42 U.S.C. § 407 which provided to the contrary [18]—a conflict which could not be reconciled. In that circumstance, wrote Judge Hill, "[a] narrow implied limitation of section 407 appears to be the only way to effectuate the operation of a Chapter 13 plan for an individual whose regular income consists of social security payments." *Id.* at 1518. The purposes of section 407 could, however, still be preserved: "such a limitation does not contravene the purpose of section 407 since the ultimate welfare of the recipient is insured [sic] by Chapter 13 procedures." *Id.* at 1517–18.[19]

In *Buren,* the Court concluded that the standards for repeal by implication had not been met. The irreconcilable conflict found in *Devall* was avoided on the basis that even if the 42 U.S.C. § 407 protections remained intact, "[a]s a practical matter, a willing debtor can simply sign his check over to the trustee." 725 F.2d at 1086.

There is no counterpart to the legislative history cited in *Devall* with regard to Social Security payments which indicates that Congress envisioned that civil service retirement funds would be available to a trustee under chapter 7. Unlike a chapter 13 proceeding, the assets which a debtor gives up in a chapter 7 proceeding are not subject to the debtor's selection. There is no equivalent procedure in a chapter 7 set-

---

**18.** 42 U.S.C. § 407 provided, prior to amendment in 1983:

The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.

In 1983, subsection (b) was added:

**(b) Inamendability of section by inference**

No other provision of law, enacted before, on or after the date of the enactment of this section, may be construed to limit, supersede, or otherwise modify the provisions of this section except to the extent that it does so by express reference to this section.

**19.** The protections of the chapter 13 procedures were outlined as follows in *Devall:*

In the present case, the assignment of funds to the trustee will not affect the recipients ability to secure basic care and maintenance. As one bankruptcy judge has explained:

A debtor in a Chapter 13 case who chooses to provide for repayment of his debts from his Social Security benefits is unlike an ordinary assignor in several respects. First, the plan of debt adjustment must be reviewed and approved by a United States Bankruptcy Judge. In approving the plan, the Court must determine that the debtor will be able to make all payments under the plan and to comply with the plan. 11 U.S.C. § 1325(a)(6). The Court will not approve a plan unless it is clear that the debtor will be able to make these payments, thus perhaps enabling him to retain property which would otherwise be subject to the claims of creditors. Unless the Court has first ascertained that the plan of repayment is feasible and will work no undue harship on the debtor or his dependents, the plan cannot be confirmed. Second, and perhaps more importantly, Chapter 13 is a wholly voluntary proceeding. A debtor cannot be forced to submit his Social Security benefits to the jurisdiction of the Court. See 11 U.S.C. §§ 303(a), 706(c), 1112(d). Moreover, a debtor under Chapter 13 has a non-waivable right to dismiss his case under Chapter 13. For this reason the debtor's benefits may not be subject to seizure in any legal process against the debtor unless and except to the extent that he so desires.

*In re Penland,* 11 B.R. 522, 524, 4 C.B.C.2d 969, 972 (Bankr.N.D.Ga.1981).

704 F.2d at 1517.

ting pursuant to which the Bankruptcy Court can cause the bankruptcy to "work no undue hardship on the debtor or his dependents" in a chapter 7 context.[20] Accordingly, SSA's contention that section 8346(a) was impliedly repealed by the Bankruptcy Act of 1978, may not prevail.

## IV

For the reasons set forth *supra* in this opinion, this Court concludes that the retirement funds herein involved are not part of the Chapter 7 estate. Because of that holding with respect to the section 541 issue, this Court, like Judge Mannes, does not reach the exemption issue under section 522(b)(2)(A).

The judgment below will be affirmed.

**20.** It is also to be noted that Congress in Public Law No. 98–21, enacted April 10, 1983, has resolved the conflict between *Buren* and *Devall* in favor of the former. *See* 97 Stat. 65, 130 (1983); H.R.Rep. No. 25, 98th Cong., 1st Sess. 82, *reprinted in* 1983 U.S.Code Cong. & Ad.News 143, 219, 301; H.R.Conf.Rep. No. 47, 98th Cong., 1st Sess. 153, *reprinted in* 1983 U.S.Code Cong. & Ad.News 404, 443.